## Williams Appeal.

Argued November 11, 1953. Before RHODES, P. J., HIRT, RENO, ROSS, GUNTHER, WRIGHT and WOODSIDE, JJ.

*Harry A. Estep*, with him *Don F. D'Ivernois* and *Harry Weisberger*, for appellant.

*Frank W. Ittel*, with him *William E. Miller, Jr.* and *Reed, Smith, Shaw & McClay*, for appellee.

572

On June 2, 1950, the Board of Adjustment of the City of Pittsburgh granted an occupancy permit for a light machine shop to Oscar J. Glies as owner, and Harry C. Williams as lessee, of a building known as 519-521-523 Foreland Street. On August 21, 1950, Marie S. Ferraro protested the issuance of the permit, and on September 20, 1950, after hearings and an inspection of the premises, the Board of Adjustment entered an order directing the Bureau of Building Inspection to order cessation of the use of the premises as a machine shop. Further hearings were held on October 9, 1950 and on October 3, 1951, following which hearings on October 11, 1951, the Board of Adjustment reversed its earlier decision and dismissed the Ferraro protest.

The County Court of Allegheny County sustained the appeal of Marie S. Ferraro and reversed the Board of Adjustment. From that judgment Harry C. Williams has appealed to this Court.

The basic zoning ordinance of the City of Pittsburgh became effective August 9, 1923. 519-523 Foreland Street was, and is, located in a use district designated as "A" Residence District. When the zoning ordinance was adopted the land was owned by Schuster Company, a wholesale grocery concern, which used it to garage and repair its own delivery trucks. The company's grocery business was conducted and merchandise stored at another location, some distance away.

The uses permitted by the ordinance in "A" Residence District did not include that use to which the then-owner devoted the property when the ordinance was adopted. The grocery company was, however, entitled to continue to use its property as a place to store and repair its trucks under the non-conforming use provisions of the ordinance.

The evidence relative to the character of the operations conducted by the Schuster Company on the property at the time of the adoption of the zoning ordinance establishes that in 1923 the owner used the premises to store and repair "four or five" trucks which it used in connection with its business and that no other trucks were garaged or repaired on the premises. Employed in the repair of the trucks were an "air compressor and air hammer to knock tires off with", a "crane to lift the motors out", a "hydraulic press to press tires off", a brake lining machine and electric drills, "hydraulic jacks, chain blocks, valve grinders". The company apparently operated "a fully mechanized shop for repairing trucks and cars".

"Around 1925 or 1926" Oscar J. Glies became a tenant of the Schuster Company and so continued for a period of nine or ten years, when the latter failed and Glies purchased the property at sheriff's sale. Glies testified that from 1925 or 1926 until 1946 he "operated a repair shop, trucks, buses, cars or anything that came in"; further, that he "made more noise than my tenants [Williams] dared make"; that in 1946 "I got my skull crushed and I sold out my business to Madison", who "continued the same business I had; also started to sell used cars there which I did not do"; that Madison continued in possession for a "couple of years" and then sold out to Clyde J. Boringer Corporation which "kept the same kind of business and also put in heavy electrical equipment". The Boringer Corporation failed in 1948 and Glies, again at sheriff's sale, purchased the premises, which, in July 1948, he leased to appellant.

Appellant testified with regard to the nature of his operations at the time of the hearings. He listed the various pieces of machinery installed and used by him in the operation of his "shop". The machinery was not designed nor intended to be employed in repairing

automobiles or trucks, but instead the premises were devoted to the operation of a machine shop where industrial machines and parts are built and repaired. He testified that he did "repair work for the Clark Candy Co.", rebuilt a turret lathe for Mellon Institute and made "parts for Mesta Machine", including "clamps for their cranes".

The evidence indicates, and the Board of Adjustment found, after visiting the premises, that appellant's operation was relatively free from noise and vibration which would be annoying to persons residing in the vicinity.

Appellant argues that there was always machinery in the building "whether for the use of repair of trucks of the owner or for some one else", that the Schuster Company operation was "machinery . . . used in connection with the garage", hence "The present occupancy simply expanded the machinery part of the business and discontinued the garage" by introducing modern machinery, the use of which is "less objectionable, less obnoxious and less noisy" than that of his predecessors.

The learned court below held that "the use by the successors of Schuster Co. was a 'new and different use', and not an 'extension of the existing use' which was the repair by Schuster Co. of its own trucks, at the time the ordinance was enacted." In the course of an able opinion it emphasized that ". . . there is a distinction between a use which is incidental to the owner's business, and a use which is the owner's primary concern". We agree, and the order will be affirmed.

There do not appear to be any Pennsylvania appellate cases dealing with the precise fact situation here involved. There are, however, a number of persuasive cases from other jurisdictions. A very recent one, *Feldman v. Hesch,* 254 S.W. 2d 914, decided by the Court of Appeals of Kentucky, is closely analo-

gous. In that case the owner and lessees of a garage in the City of Newport sought to enjoin the municipal authorities from interfering with their use and continued occupancy of the building. When the city zoning ordinance was enacted the neighborhood was zoned residential. The ordinance contained the customary provision allowing the continuance of non-conforming uses. At that time the owner was engaged in the dairy business and used the garage building for storing and servicing some seven or eight delivery trucks. About two years after adoption of the ordinance he leased the building to used car dealers. The latter used the place to wash, paint, repair and otherwise recondition automobiles purchased for resale. The actual buying and selling of cars was conducted at a lot in another part of the city. The Kentucky Court affirmed a judgment denying injunctive relief, pointing out, at page 916, that the owner of the garage had used it "as a remote adjunct to a milk business", while the lessees used it "as an integral part of a used car business"— a "changed use" in violation of the ordinance.

The Court cited with approval *People v. Giorgi*, 16 N.Y.S. 2d 923, wherein it was held that premises used by a building contractor for the purpose of manufacturing concrete blocks for use in his business could not be used by another person for the purpose of manufacturing concrete blocks for sale to the general public; and *Lexington v. Bean*, 272 Mass. 547, 172 N.E. 867. There a person engaged in the trucking business used a garage building as a place in which to repair his own trucks, occasionally permitting others to store and repair automobiles therein. Later the use of the building was changed to that of a public garage for the repairing of motor vehicles for hire. The Massachusetts Court held that the latter use was not permissible, it being a substantial change of the original non-conforming use.

In *Price v. Ackmann*, 345 Ill. App. 1, 102 N.E. 2d 194, the zoning ordinance adopted in 1928 placed a certain barn in a residential use district. The owner of the barn used it as a carpenter shop, fitted with work bench, hand tools and a portable gasoline engine. It was used for the storage of tools and a meeting place each morning and evening for the owner's employes. Some carpenter work was performed there. In 1947 the building was "transformed to a somewhat modern mill equipped with modern electrically driven machinery and turning out mill work of all kinds used in the building trades". The Illinois Court stated at page 197: ". . . by the installation of electric power and new machinery, the original nature and purpose of this shop has undergone such a decided change as to exclude it from the category of an 'existing use' as defined by the authorities."

In *Lynch v. Borough of Hillsdale*, 136 N.J.L. 129, 54 A. 2d 723, the principle is set forth at pages 725-726 that "A pre-existing non-conforming use may not be enlarged or radically modified simply because the new use would be 'no more harmful' than the old to the adjacent landowners."

In Pennsylvania most of the cases dealing with non-conforming uses might be characterized as "natural growth" cases. They involve the situation wherein an humble use which existed when a zoning ordinance was adopted is expanded and intensified without modification of its original basic nature.

In *Cheswick Boro. v. Bechman*, 352 Pa. 79, 42 A. 2d 60, the owner of approximately 14 acres of land leased it to one Sidwell for the purpose of a sand and loam business. About two years later the borough enacted a zoning ordinance which placed the tract in a residential use district. The ordinance provided, however, for non-conforming uses. Two years after adop-

tion of the ordinance Sidwell transferred the business to the Bognars, who greatly extended the depth and area of Sidwell's operations. Bognars screened the material by means of a mechanical device known as a "rotary screen", a device not used by Sidwell. The Supreme Court stated at page 82: "The prohibition of the Ordinance is directed to new uses; it imposes no restraint upon broadening the scope of the existing use."

In *Firth v. Scherzberg*, 366 Pa. 443, 77 A. 2d 443, defendant purchased certain property in Philadelphia in 1924 and used it as a storage or parking place for his trucks in his business of local and long distance hauling by motor vehicle as a private and public carrier. In 1932 he purchased an adjoining piece of property upon which he erected a relatively large garage, which land and garage he likewise devoted to his business. In 1933 the city enacted a zoning ordinance whereby the premises were included in a residential use district. Defendant continued to use his property as a permissible non-conforming use and in 1940 leased it to Blades who, in 1949, became Harry A. Blades, Inc. As individual and corporation Blades continued to use the property for the same business purpose. With respect to the operations of the corporation the Supreme Court stated at page 445: "The use of the property consists of the parking or storage there of tractors and trailers, particularly the latter which ofttimes are interchanged between tractors according to the destinations of the cargoes and the economical disposition of the tractors. No freight is loaded or unloaded there; no garage work done; and no part of the premises is used by motor vehicles of anyone other than Harry A. Blades, Inc." One contention in the case was that the operation of the corporation violated the zoning ordinance. The Court stated at page 449:

"Neither the natural growth of a business, existing at the time of the enactment of a zoning ordinance, nor the adoption thereafter of more modern instrumentalities, suitable and helpful in carrying on the business, works a change of use in legal contemplation."

In *Davis Appeal*, 367 Pa. 340, 80 A. 2d 789, the issue, in the words of the Supreme Court, was: "Where the maintenance of a multiple family dwelling—in other words an apartment house—was a nonconforming use in a single family district under the provisions of a zoning ordinance, but was in existence at the time of the enactment of the ordinance, may it subsequently increase the number of its apartments?" Following familiar principles, the Court answered the question in the affirmative.

*Haller Baking Company's Appeal*, 295 Pa. 257, 145 A. 77, presents a slightly different facet on the problem of non-conforming uses. A stable was constructed in 1915 in an area which in 1927 became a residential use district. The stable was used from 1915 to 1924 by an ice company to stable horses used in its business. When the zoning ordinance was adopted, and for some time prior thereto, the stable was used only intermittently and then only for a horse or two. The ordinance prohibited a major stable (more than four horses) in the use district in which the stable was located. Haller Baking Company purchased it after the enactment of the ordinance and wished to use it as a major stable. The contention was advanced that the existing use was not that of a major stable and that there was no non-conforming use for the company to continue. The Supreme Court stated: "Where a property is built for or adapted to a particular use, the question of existing use is determined by ascertaining as near as possible the intention of the owner, in connection with the fact of a discontinuance or ap-

parent abandonment of use; it is not to be determined on the basis of actual or substantial use on the date of the adoption of the ordinance."

Our present case is governed by the principle set forth in *Darling v. Zoning Board of Adjustment of Philadelphia*, 357 Pa. 428, 54 A. 2d 829. A certain building used "as an office for builders, architects and/or real estate operators" fell in a residence use district in 1933 when Philadelphia adopted its basic zoning ordinance. Darling later acquired the building and applied for and received a use-registration permit to repair and use it as a tailoring shop. An appeal by an owner of adjacent property was sustained by the Board of Adjustment and the permit ordered revoked. The Court of Common Pleas reversed the Board and granted the permit. In reversing the lower court's decision, the Supreme Court stated: "The court erred in allowing a change of a nonconforming use to a use designated for a district having less restrictive regulations."

We believe, but need not decide, that when Glies started to operate a public garage on the Foreland Street property there was a substantial change from the use which existed at the time of the adoption of the zoning ordinance, that of storing and repairing trucks belonging to the then-owner and used by it elsewhere in its business. The premises were no longer a "remote adjunct" of the grocery business; they were an "integral part" of a public garage. That there had been a substantial change of the existing use is even clearer when Madison took over from Glies and added a used car business to the garage business developed by Glies.

Even assuming that the existing use had not been changed by the operations of Glies and Madison, the business conducted by the appellant bears no resem-

blance to that of the Schuster Company. It cannot be held that the business of manufacturing and repairing industrial machinery represents "natural growth" or expansion of a non-conforming use which consisted of storing and repairing trucks belonging to the owner of the land. It is immaterial that appellant's operation is "less objectionable, less obnoxious and less noisy" than that of the Schuster Company. The important consideration is that it is *different*.

Article V, section 18(b) of the Zoning Ordinance of the City of Pittsburgh provides in part: "If no structural alterations are made, a non-conforming use of a building may be changed to another non-conforming use of the same or a higher classification." With respect to whether the appellant was aided by this provision, the court below stated: ". . . a machine shop is of a lower classification for the reason that the zoning ordinance in the case at bar prohibits repair shops in a commercial district (sec. 7), but as an exception to this (sec 15) provides that in commercial districts an automobile repair shop or repair facilities shall be permitted. The fact that automobile shops or repair facilities are excepted from the general prohibition of general repair shops in commercial districts, shows that the automobile repair shops are of a higher classification since they are permitted in commercial districts, whereas all other repair shops (except a carpenter shop without machinery) are prohibited in commercial districts." We agree with the conclusion of the learned court below that ". . . the non-conforming use in existence prior to and at the time of the passage of the ordinance was not changed to a non-conforming use of the same or higher classification, but that the machine shop now existing on the premises is of a lower classification under the ordinance."

Order affirmed.