## M. & M. Stone Co. v. Zoning Board of Adjustment of Lower Salford Township

*William F. Fox*, for appellant.

*Robert W. Tredinnick*, for zoning board of adjustment.

FORREST, J., July 1, 1958.—This is an appeal from the decision of the Zoning Board of Adjustment of Lower Salford Township. The Board affirmed the decision of the zoning officer of the township refusing a permit to construct concrete foundations for the installation of equipment to process bituminous concrete and refusing a use permit for the operation of said equipment.

The board supplied a résumé of the testimony essentially as follows:

1. Appellant, M. & M. Stone Company has leased a property consisting of approximately 28 acres bounded on the north by Indian Creek Road and on the south by Meeting House Road, Lower Salford Township, Montgomery County, Pa., from Reinhart Groff, the owner.

2. Said premises has contained a quarry for approximately 30 years, and appellant, under its lease, has quarried, processed and graded stone thereon, and shipped stone therefrom for approximately 3 years.

3. Said premises and all the properties immediately adjacent thereto are in the same "Residential 1" zoning district under the Lower Salford Township Zoning Ordinance of 1956. Section 601 of this ordinance by reference to section 501 permits a lot in a district so zoned to be used for single-family detached dwellings, agriculture, and, when authorized as a special exception, certain other specified purposes.

4. On Meeting House Road, across the street from appellant's property, there is a slaughterhouse which is a nonconforming use.

5. On Meeting House Road, approximately 2,000 feet from appellant's property, L. F. Kulp and Son operate a butter processing plant, which is also a nonconforming use.

6. On Meeting House Road, approximately 3,000 feet from appellant's property, there is an automobile repair shop, which is also a nonconforming use.

7. The remaining property adjacent to appellant's property is used for agricultural and residential purposes.

8. Appellant seeks a permit to install upon a portion of its property, a concrete foundation, upon which will be placed equipment for the production of bituminous concrete, commonly known as asphalt. The equipment will consist of a dryer, elevator, bin, two scales, mixer, asphalt tanks and a primary and wet secondary

dust catcher. It will occupy an area of approximately 60 by 100 feet; it is 40 feet high at most. Its capacity will be 100 tons of asphalt mix per hour. The installation will cost approximately $200,000.

9. The asphalt so proposed to be produced will be sold as a "completed product" for use in surfacing highways, parking areas, and the like.

10. The equipment will be operated not in excess of nine hours per day.

11. The equipment will be located approximately 300 feet from Meeting House Road.

12. The noise from the operation of the equipment will not be nearly as great as from the rock crushing equipment presently in use in the quarry which is 300-400 feet away. The oil burner will be the noisiest piece of equipment but that will be audible for a distance not in excess of 150 feet.

13. The equipment will contain a wet process dust collector manufactured by a concern which guarantees 97 percent effectiveness.

14. The asphalt can be used on surfaces within approximately 10 miles of the equipment. If carried for a greater distance, the asphalt begins to harden.

15. Heating will be obtained by using number 2 fuel oil, so that the discharge stack on the equipment will be free of noxious fumes and smoke.

16. Tar, the one raw product needed by appellant for the processing, will be delivered in sealed containers of 4,000-gallon capacity trucks and from thence will be pumped into storage tanks, and from thence through closed pipes into the mixer.

17. The mixing operation is conducted with tar at an average temperature of 250 degrees Fahrenheit. The odor from this operation is "not as bad as odor from a diesel truck." The pure asphalt is odorless; only the impurities in the asphalt produce an odor

which, however, cannot be detected more than 150 feet from the operation.

18. The asphalt will be hauled from the premises in trucks. The material will be covered by canvas, so that odor will be minimal.

19. In order to be profitable, the equipment should produce 20,000 tons per year. However, it is capable of producing 5,000 tons per week.

20. Certain residents of the neighborhood complain about noise and dust caused by the present operation.

21. Certain residents of the neighborhood fear that the delivery trucks would endanger children living in close proximity to the operation.

22. The residents in the neighborhood are unanimous or virtually unanimous in opposing the granting of a permit.

23. The court also takes notice and finds as a fact that equipment for mixing bituminous concrete is in use in some of the quarries in the area, and the furnishing of such product is a usual and ordinary service rendered in conjunction with the operation of quarries.

24. The ordinance also provides:

"Section 1200. Any land, the existing lawful use of which at the time of passage of this Ordinance, does not conform with the regulations of the district in which it is located, shall have such use considered as nonconforming use, which may continue on such land but shall be subject to the regulations covering nonconforming use . . .

"Section 1205. The Board of Adjustment shall have discretion to determine what . . . change of nonconforming use is of the same class of use and permissible."

### Discussion

The land involved in this appeal was used for the purpose of a quarry and for the purpose of processing and grading stone therefrom for many years before

the enactment of the Lower Salford Township Zoning Ordinance of 1956. Such activities therefore are valid nonconforming uses in accordance with section 1200 of the ordinance.

"It is not essential that the use, as exercised at the time the Ordinance was enacted, should have utilized the entire tract. To so hold would deprive (appellants) of the use of their property as effectively as if the Ordinance had been completely prohibitive of all use. This result could not have been intended": Cheswick Borough v. Bechman, 352 Pa. 79, 82 (1945). See also Humphreys v. Stuart Realty Corporation, 364 Pa. 616, at 621 (1950) ; Firth v. Scherzberg, 366 Pa. 443, at 449-50 (1951).

This is particularly so where the business carried on is the excavation of loam and sand, as in the Cheswick Borough case, or the excavation of stone, as in the present case.

Installation of modern and more effective instrumentalities in a business will not bring it within the prohibition of the ordinance if, in fact, there was an existing use, provided these are ordinarily and reasonably adapted to the carrying on of the existing business. Cheswick Borough case, supra, page 82.

It may be contended that equipment for the application of tar to the materials extracted from the quarry, thereby producing asphalt, has never heretofore been installed on this property, and that such use is different than any prior use. As was said in Yocom's Appeal, 142 Pa. Superior Ct. 165, 173 (1940) : "It may be said that all differences are differences of degree, but for purposes of comparison and classification the degree of difference may be so great as to be capable of being called a difference in kind." However, in our opinion the decision in this case hinges upon different considerations.

Counsel for the intervenors who have opposed the granting of a permit contends that there is a clear distinction between the quarrying operation and the proposed industrial use, that the important thing is that it is different (citing Williams Appeal, 174. Pa. Superior Ct. 570, 580 (1954)), and that it would be just as consistent to permit the construction of an oil refinery, as it would the proposed equipment, on the property. However, as we view it, incidental to a primary use, there may be an accessory use. Such accessory use has been defined as "a second use, not directly connected to or with the main purpose, but one which is recognized by tradition, custom or ordinary usage as being reasonably necessary to the primary use": Wolffe, Pa. Zoning Digest, pages 24-5.

"Uses reasonably accessory to a nonconforming use will be permitted." Rathkopf, Law of Zoning and Planning, Vol. 2, p. 47.

Otherwise stated, a proposed use will be permitted where it is so "intrinsically and inherently related to an existing use as to be fairly construed as included within that use": Everpure Ice Mfg. Co., Inc. v. Board of Appeals, 324 Mass. 433, 436, 86 N. E. 2d 906, 909 (1949).

The test has been said to be whether the proposed use is a part and parcel of the nonconforming business or whether it is such a new and entirely different use as to prevent it being regarded as included within a previously existing nonconforming use: Everpure Ice Mfg. case, supra.

". . . the area devoted to each (use-primary and incidental), the nature of the business, trade, or occupation, the necessity or desirability of having the two uses linked are often factors that are considered in determining what is accessory": Wolffe, op. cit., pages 24-5.

In the instant case there is evidence that installations of a character such as that proposed by this appellant are in operation at King Manor and at Corson's Quarry, both in Montgomery County, and elsewhere in Pennsylvania, as an adjunct of quarry operations. In our opinion such use is reasonably accessory to the existing nonconforming use. The decision of the board of adjustment was tantamount to a determination that the proposed use is not only a *change* of nonconforming use, but *not permissible*. We have already indicated that we do not consider the proposed use a *change* of nonconforming use. However, even if such were the case, we are of the opinion that this installation will be less objectionable than the present operation of the quarry. The noise will not be audible for a distance greater than 150 feet and will be considerably less than that produced by the rock crushing equipment now in the quarry. The dust-collecting equipment will be 97 percent effective and there will be virtually no fumes. In addition, it should not be forgotten that this quarry is a depleting asset and the operation of the equipment proposed to be installed will cease when the quarry has been "worked out." Section 1205 of the ordinance cannot be construed as giving the board of adjustment unlimited discretion to determine whether a certain use is actually a change of nonconforming use or, if so, whether such a change is of "the same class of use and permissible." The decision of the board may be reversed for error of law or flagrant abuse of discretion: Moyerman v. Glanzberg, 391 Pa. 387, at 396 (1958); Hasley's Appeal, 151 Pa. Superior Ct. 192, at page 194 (1943).

Various owners or occupants of properties in proximity to the premises of the appellant objected to the granting of a permit, and the court granted them leave to intervene in this appeal. Their objections are directed primarily to the operation of the quarry, which is

not an issue, rather than to the proposed installation and operation of the bituminous processing equipment. "It is clear that a board of adjustment does not properly exercise its discretion if it considers the number of protestants rather than the nature and quality of their objection": Lindquist Appeal, 364 Pa. 561, 565 (1950). Suffice it to say that if the present or proposed operation of the quarry or equipment should constitute a nuisance, the intervenors would not be without a remedy.

The board of adjustment based its decision in part on increased traffic which would result from the granting of the permit. Undoubtedly there will be an increase of traffic on the road from whence the driveway into the site of the equipment will be laid out.

"*Any* traffic increase with its attendant noise, dirt, danger and hazards is unpleasant, yet, such increase . . . *standing alone* does not constitute a sufficient reason to refuse a property owner the legitimate use of his land. . . . It is not *any* anticipated increase in traffic which will justify the refusal of a (permit) in a zoning case. The anticipated increase in traffic must be of such character that it bears a substantial relation to the health and safety of the community": Archbishop O'Hara Appeal, 389 Pa. 35, 54 (1957).

There is no such evidence in this case; there is only an unsworn statement of an intervenor that in his opinion the appellant's trucks would endanger children who live in the vicinity.

As to depreciation of values of real estate in the community there is also only an unsworn statement of a real estate broker that in his opinion the installation of the proposed unit would adversely affect the value of property.

Finally, the board denied the appeal for the reason that the height of the structure proposed to be installed is 40 feet whereas section 406 of the ordinance provides

that "No building or structure shall exceed thirty-five (35) feet in height, except that building or structures for agricultural uses, and uses accessory to agriculture, may exceed thirty-five feet but shall not exceed sixty (60) feet in height." "Building" is defined by section 200(4) of the ordinance as "Any structure having enclosed walls and roof, permanently located on the land." "Structure" is defined by section 200(29) of the ordinance as "Any form or arrangement of building materials involving the necessity of providing support, bracing, typing, anchoring or other protection against the forces of the elements." The equipment proposed to be installed is neither a building nor a structure as defined by the Ordinance and, therefore, is not subject to the limitations of height contained in Section 406 of the Ordinance.

The reasons given by the board for the refusal of the permit are insufficient in law to sustain its decision. No other sufficient reason having been advanced, the court reluctantly concludes that the decision was erroneous as a matter of law.