MR. AND MRS. T. L. ATKINS; MARIAN G. AUSTIN; MR. AND MRS. FRANK
BORDEAUX; MR. AND MRS. CHARLES R. BROWN; MR. AND MRS. SAM
BRYANT; H. G. CAMPBELL; MR. AND MRS. JERRY R. COOPER; MR.
AND MRS. RICKEY DEESE; DAVID DODD, JR.; DAVID EUDY; MR. AND
MRS. FRANK FOX; MR. AND MRS. LEROY GILL; MR. AND MRS. FRANK
GODFREY; MR. AND MRS. JAMES W. GRIFFIN; MR. AND MRS. JOHN
HAMMONDS, JR.; PAULINE HAMMONDS; MR. AND MRS. ERNEST
HELMS; MR. AND MRS. KEVIN M. HELMS; MR. AND MRS. EARL M.
HERRING; MR. AND MRS. DAVID W. HILLIARD; MR. AND MRS.
CHARLES F. HOLT, SR.; CHARLES F. HOLT, JR.; SANDRA HOLT;
GEORGE HUNT; MR. AND MRS. BILL LAWRENCE; MR. AND MRS.
NELSON L. LONDON; MR. AND MRS. FRANK MANESS; MR. AND MRS.
MIKE MILLS; MR. AND MRS. M. T. MEANS; JAMES McCOLLOM; MR.
AND MRS. HEATH NASH; WILLIAM HEATH NASH, JR.; MR. AND MRS.
JOEL BRUCE NEWELL; MARGARET A. NELSON; T. B. PLYLER; MR.
AND MRS. ARNOLD D. PRICE; MR. AND MRS. JASON B. RUSHING; MR.
AND MRS. BRUCE SNYDER, JR.; R. C. SNYDER; MR. AND MRS. JAMES
E. STARNES; MR. AND MRS. LEON R. SIMON; MR. AND MRS. JOE N.
SUTTON; JEAN TUCKER; MR. AND MRS. LARRY G. WHITE; MR. AND
MRS. L. K. WILLIAMS; AND MR. AND MRS. BOBBY R. WALLACE, PETI-
TIONERS v. THE ZONING BOARD OF ADJUSTMENT OF UNION COUNTY,
NORTH CAROLINA (CONSISTING OF CHARLES YANDLE, CHAIRMAN OF THE
BOARD; LEON MOORE, VICE CHAIRMAN OF THE BOARD; CHARLES McGEE,
JACK HAYWOOD, CLARK RUMMAGE, MEMBERS OF THE BOARD; AND
WILLIE McDOW AND G. C. FUNDERBURK, ALTERNATE MEMBERS OF THE
BOARD), RESPONDENTS

No. 8020SC1093

(Filed 15 September 1981)

1. **Municipal Corporations § 30.15— zoning ordinance—nonconforming use—uses
and structures begun after ordinance date**

A zoning board of adjustment had no authority to grant Class A non-
conforming status to uses and structures added to a landowner's agricultural
supply business where the new uses and structures were not lawful at their in-
ception because they were begun after the effective date of the zoning or-
dinance and because no building permit was issued. Furthermore, the board of
adjustment had no authority to grant Class A nonconforming use status to
proposed uses and structures which were not in being at the time the land-
owner filled his petition for Class A nonconforming use status.

2. **Municipal Corporations § 30.15— zoning—nonconforming use—Doctrine of Ac-
cessory Uses**

Under the Doctrine of Accessory Uses, a landowner is permitted to main-
tain an accessory or incidental use in connection with a permitted nonconform-
ing use of land if the accessory use is truly incidental to the primary noncon-
forming use and does not change the basic nature of the use of the property.

3. **Municipal Corporations § 30.15 — zoning — additional uses not incidental to non-conforming uses**

   Where property was being used for the storage and sale of grain, fertilizer, and lime and for seed cleaning on the effective date of a zoning ordinance, use of the property for the storage and transportation of sand, gravel, and lumber was not incidental to such nonconforming uses of the property and was not permitted under the Doctrine of Accessory Uses.

APPEAL by respondents from *Collier, Judge.* Judgment entered 18 June 1980 in Superior Court, UNION County. Heard in the Court of Appeals 5 May 1981.

This case came before the superior court upon a petition for a writ of certiorari to review the 18 June 1980 decision of the Union County Zoning Board of Adjustment (Board) which granted to James Dennis Rape's agricultural service business Class A nonconforming use status. The petitioner-appellees alleged (1) that they were owners of property adjacent to property owned by Rape in an area zoned residential; and (2) that, although Rape has maintained an agricultural service business on his land as a prior nonconforming use since 2 June 1975 when the applicable Union County Zoning Ordinance (Ordinance) became effective, Rape expanded the nonconforming use of his land after 2 June 1975 without applying for Class A status.[1] After expanding the nonconforming use, Rape, in 1980, filed a petition requesting the Board (1) to grant Class A nonconforming use for the structures *and* for the uses which were existent on Rape's property on 2 June 1975; (2) to designate those structures and uses erected or undertaken since 2 June 1975 as Class A nonconforming uses and structures; and (3) to allow as Class A nonconforming use, the enlargement of the facility by the addition of 10,000 square feet to a warehouse and the enlargement of grain storage bins by 100,000 bushels.[2] The Board granted Rape the relief he requested.

Upon review, the superior court ordered the Board to modify its order by (1) deleting therefrom its conclusion that the alterations to the property made after 2 June 1975 constituted Class A

---

1. In 1978, Rape petitioned to have his property rezoned "heavy industrial," but his petition was denied by the Board.

2. According to Rape, the expansion of his facilities was necessary because the area farmers accepted him and his business grew from a one-million dollar enterprise in 1975 to a three-million dollar enterprise in 1979.

nonconforming uses and by (2) adding a conclusion that the only uses and structures allowed be those lawfully in being on the property as of 2 June 1975. The Board appeals.

*Perry & Bundy, by H. Ligon Bundy and Henry B. Smith, Jr., for respondent appellants.*

*Dawkins, Glass & Lee, P.A., by Koy E. Dawkins, for petitioner appellees.*

BECTON, Judge.

I

[1] This is not the usual proceeding on appeal in which we must determine if the findings of fact and conclusions of law of an administrative board are supported by competent evidence. Indeed, after the trial court found and concluded that the Board's findings and conclusions were supported by competent, material and substantial evidence, the trial court determined, as a matter of law, that certain uses and structures, described in the Board's Order, "were not being conducted on the effective date of the Ordinance and therefore not lawful non-conforming uses nor otherwise lawful in their inception." We agree with the trial court. The uses and structures placed upon the property after 2 June 1975 or proposed to be added in the future, are not Class A nonconforming uses and structures as defined by the Ordinance.

A.

The facts are undisputed. On and prior to 2 June 1975 Rape had on his approximately four-acre tract the following: (a) one 37,000-bushel bin; (b) one 21,000-bushel bin; (c) one 80 x 20 storage building; (d) one office building addition started but not completed; (e) one 10 x 40 weigh scale; (f) one grain elevator; and (g) one 80 x 28 storage facility for fertilizer. On and prior to 2 June 1975 Rape's property was being used for the storage and sale of grain, fertilizer, and lime and for seed cleaning. Following 2 June 1975 the following additions and alternations were made on Rape's property: (a) one 14,000-bushel bin with dryer; (b) one grain elevator 60 feet in height; (c) one 12,000-bushel bin; and (d) one 10 x 25 tool shed. Additionally, the 80 x 20 storage building was removed in December 1979 leaving only the foundation, to which

was added a retaining wall four feet high and six inches wide in the shape of a horseshoe, which was used to store sand, rocks and lumber.

Rape supplies his local customers with lime which he gets from lime suppliers in Tennessee and Virginia. Driving to his lime suppliers became expensive, especially with the rising cost of fuel, so Rape decided to stock sand, rocks and lumber and to sell and deliver those products along the route to his lime suppliers.

### B.

We look first to the enabling legislation and then to the Ordinance. G.S. 153A-345 authorizes boards of county commissioners to appoint boards of adjustment to assist in the administration of zoning ordinances, and this statute also defines the powers that boards of adjustment have. G.S. 153A-345(d) gives boards broad discretionary power to vary the provisions of zoning ordinances relating to land use and construction or alteration of structures, and provides as follows:

> (d) When practical difficulties or unnecessary hardships would result from carrying out the strict letter of a zoning ordinance, the board of adjustment may, in passing upon appeals, vary or modify any regulation or provision of the ordinance relating to the use, construction or alteration of buildings or structures or the use of land, so that the spirit of the ordinance is observed, public safety and welfare secured, and substantial justice done.

In accordance with the enabling legislation, the Ordinance, itself, contains provisions for nonconforming use in Article VII and provisions for variances[3] in Article XII. Nonconforming use is defined in Article IV, Section 41.48 of the Ordinance as "[a]ny use of a building or land which does not conform to the use regulations of this ordinance . . . at the effective date of the ordinance. . . ." The relevant portions of Article VII follow:

Section 70.  *Non-conforming Uses*

> Non-conforming uses and structures are those which do not conform to a provision or requirement of this ordinance

---

3. Rape did not request a variance; rather, he petitioned for a Class A nonconforming use designation.

*but were lawfully established prior to the time of its applicability.* Class A non-conforming uses or structures are those which have been so designated by the Board of Adjustment, after application by any interested person or the Zoning Administrator upon findings that continuance thereof would not be contrary to the public health and safety or the spirit of this Ordinance, that the use or structure does not and is not likely to significantly depress the value of nearby properties [sic] *that the use or structure was lawful at the time of its inception,* and that no useful purpose would be served by strict application of the provisions or requirements of this ordinance with which the use or structure does not conform. All non-conforming uses and structures not designated as Class A are Class B non-conforming uses or structures.

70.1  *Procedures for Obtaining Class A Designation, Conditions*

A written application shall be filed setting forth the name and address of the applicant, giving a legal description of the property to which the application pertains and including such other information as may be necessary to enable the Board of Adjustment to make a determination of the matter . . . . The decision shall be in writing and shall set forth the findings and reasons on which it is based. Conditions shall be attached, including any time limit, where necessary, to assure that the use or structure does not become contrary to the public health and safety, or the spirit and purpose of this ordinance. No vested interest shall arise out of a Class A designation.

70.3  *Regulations Pertaining to Class A Nonconforming Uses And Structures*

No Class A nonconforming use shall be resumed if it has been discontinued for a continuous period of at least 180 days or if it has been changed to a nonconforming use for any period. *No Class A structure shall be used, altered, or enlarged in violation of any condition imposed in its designation.* No Class A nonconforming use shall be rebuilt, for use as a nonconforming structure, if the cost of reconstruction ex-

ceeds sixty percent (60%) of the reproduction cost of such structure. (Emphasis added.)

Article IV, Section 60 of the Ordinance is also significant. This section states: "No building or land shall be hereafter used and no building or part thereof shall be erected, moved or altered except in conformity with the regulations herein specified for the district in which it is located, except as hereinafter provided in this ordinance."

## C.

Having set forth relevant portions of the enabling legislation and the Ordinance, we turn to the Board's arguments. Because Section 70.3 of the Ordinance provides that "[n]o Class A structure shall be used, altered or enlarged in violation of any condition imposed in its designation," the Board argues that "this clearly implies that the alterations are permitted when they are not contrary to the conditions imposed by the Board." In further support of this argument, the Board points out that since Section 70.4 of the Ordinance expressly prohibits the enlargement or alteration of Class B nonconforming structures then, by implication, the alteration or enlargement of Class A nonconforming uses and structures is allowed since no such clear expression appears in Section 70.3.

Our response is threefold. First, Section 70.3 applies only to a Class A structure or use *previously designated* by the Board. Rape was merely *applying* for a Class A designation. Because Rape's agricultural service business was established and operating prior to 2 June 1975 and because Rape did not seek Class A nonconforming use status until 1980, Rape's agricultural service business had, during that period of time, Class B nonconforming use status by operation of the Ordinance. The last sentence of Article VII, Section 70 reads: "All non-conforming uses and structures not designated as Class A are Class B nonconforming uses or structures." Rape made alterations and enlargements to his agricultural service business in violation of Article VII, Section 70.4 which, in relevant part, reads: "No Class B nonconforming structure shall be enlarged or structurally altered [other than through ordinary maintenance]." Having violated the Ordinance, Rape cannot now seek its blessing by the

ratification he requested. Having failed in his effort in 1978 to have his property zoned "heavy industrial," Rape cannot now obtain what amounts to spot zoning in circumvention of the Ordinance. Although the enabling legislation and the Ordinance give the Board the power under certain circumstances to allow expansion of Class A nonconforming use, Rape's problem is that he never obtained a Class A nonconforming use prior to his expansion.

Second, Section 70.3 applies only when a condition was imposed at the time the structure or use was given a Class A designation. Rape was never granted a Class A designation to which a condition could have been imposed. Third, alterations or enlargements of Class A nonconforming uses and structures are allowed if, and only if, they are made "in conformity with the regulations . . . in this ordinance." Article IV, Section 60. Rape's alterations and enlargements were not made in conformity with the regulations.

In addition to our factual analysis, we are guided by policy considerations. That is, although zoning ordinances are "in derogation of the right of private property and provisions therein granting exemptions or permissions are to be liberally construed in favor of freedom of use," *In Re Application of Construction Co.*, 272 N.C. 715, 718, 158 S.E. 2d 887, 890 (1968), our courts have nevertheless limited the expansion of nonconforming uses with a view toward their eventual elimination. As was said in *In Re O'Neal*, 243 N.C. 714, 721, 92 S.E. 2d 189, 194 (1956):

> [Z]oning serves a two-fold purpose — one, to preserve the true character of a neighborhood by excluding new uses and structures prejudicial to the restricted purposes of the area, *and gradual elimination of such existing structures and uses*; and, second, to protect an owner's property or existing residence, business or industry from impairment which would result from enforced accommodation to new restrictions. . . . (Emphasis added.)

We hold that the Board had no authority to grant Class A nonconforming status to uses and structures added after 2 June 1975, the effective date of the Ordinance. The new uses and alterations made by Rape were not lawful at their inception because they were begun after the effective date of the Ordinance

and because no building permit was issued. Professor Anderson puts it this way:

> To qualify as a nonconforming use, the use in issue must exist on the date specified in the ordinance. Thus, if a nonconforming use as defined by the ordinance as one which existed before the passage of the restrictive ordinance, a use may be continued after passage only if it existed prior to that date. . . . A use commenced after the specified day gains no right to continue as a nonconforming use.

Anderson, American Law of Zoning 2d § 6.10 (1976). Additionally, according to Professor Anderson, "[t]he failure of a landowner to obtain a building permit required by law, before establishing a use, may render the use unlawful from its inception and disqualify it to continue as a nonconforming use." *Id.* Sec. 6.16; cf. *Eggert v. Board of Appeals*, 29 Ill. 2d 591, 195 N.E. 2d 164 (1963) (the Supreme Court of Illinois held that an owner, who, without a building permit, converted a three-family dwelling to one which accommodated seven families was not entitled to continue as a nonconforming user).

We summarily reject the Board's argument that it had authority to grant a Class A nonconforming use designation to uses and structures which were merely prospective and not in being at the time Rape filed his petition. Additionally, since Rape failed to comply with the Ordinance, it is not necessary to determine whether a nonconforming user may expand his operation in order to accommodate an increase in business when the expansion does not change the fundamental nature of the business.[4]

## II

In a closely related argument, Rape contends that the Board properly authorized the addition of uses which were merely incidental to his nonconforming use. In addition to authorizing an increase in the number of structures located on Rape's property, the Board authorized Rape to store sand and gravel and to

4. Some courts have adopted the "Doctrine of Natural Expansion" which Rape urges upon us. *See, for example, Silver v. Zoning Board of Adjustment*, 435 Pa. 99, 255 A. 2d 506 (1969); *Frost v. Lucey*, 231 A. 2d 441 (Me. 1967); *Great South Bay Marine Corporation v. Norton*, 58 N.Y.S. 2d 172 (1945), aff'd. 272 A.D. 1066, 75 N.Y.S. 2d 304 (1947).

transport sand, gravel and lumber if those products were sold in conjunction with the hauling of grain, lime and fertilizer in order to avoid "dead-heading"[5] and if those products were transported in trucks owned or regularly leased by Rape.

[2, 3] Under the Doctrine of Accessory Uses, a landowner is permitted to maintain an accessory or incidental use in connection with a permitted use of land if the accessory use is truly incidental to the primary nonconforming use and does not change the basic nature of the use of the property. Anderson, American Law of Zoning 2d § 630 (1976); *Jackson v. Pottstown Zoning Board of Adjustment*, 426 Pa. 534, 233 A. 2d 252 (1967). Given the nature of Rape's agricultural service business, we are not convinced that the stockpiling or transportation of sand, gravel or lumber is incidental to any use of Rape's property permitted by the Ordinance. Rape's reliance on *In Re O'Neal* is misplaced. In *O'Neal*, the operators of a nonconforming nursing home, in order to comply with fireproofing requirements of the North Carolina Building Code, opted to construct a fireproof building which, in terms of its size and scale of operation, would have conformed substantially to the nonconforming use existent at the time the ordinance in question was adopted. The operators of the nursing home did not intend to demolish the old building but, rather, proposed to use it for porches, sitting rooms, and other recreational purposes. Whether the old building could have been used, for what may have been accessory purposes, was not squarely before the court. In dicta the court said:

> If this should occur, the question may then arise as to whether the present two-story frame building must be used for residential purposes only in conformity with Residence 1 District restrictions, or whether the facts presented are such that the Board of Adjustment, in its discretion, will permit limited use thereof by patients resident in the new building for some or all of the purposes indicated in Mr. O'Neal's statement. In such case, it will be for the Board of Adjustment to determine whether, in its discretion, it will so exercise the power conferred upon it [by the section of the Ordinance relating to variances].

5. The sand, gravel and lumber were transported and sold in order to avoid having to drive empty trucks to the lime suppliers and in order to off-set rising fuel costs.

243 N.C. at 725, 92 S.E. 2d at 196.

Rape, too, may be entitled to a "variance"; that question is not before us. We hold that an "accessory use" has not been established. *Compare City of Brevard v. Ritter*, 14 N.C. App. 207, 188 S.E. 2d 41 (1972) in which this Court held that the construction of a pilot's lounge and auxiliary hangar at the defendants' "nonconforming" private airport was not a recreational use within the meaning of a zoning ordinance allowing "camps, parks, picnic areas, golf courses and similar recreational uses." *Id.* at 214, 188 S.E. 2d at 45.

Having determined that the trial court's order was proper in all respects, we accordingly

Affirm.

Judge VAUGHN and Judge ARNOLD concur.