587 A.2d 1205

**COUNTY COMMISSIONERS OF CARROLL COUNTY, Maryland**

v.

**Maurice R. ZENT.**

**No. 950, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

April 4, 1991.

Laurell E. Taylor, Asst. County Atty. (Charles W. Thompson, Jr., County Atty., on the brief), Westminster, for appellant.

William B. Dulany (David K, Bowersox and Dulany, Parker & Scott, on the brief), Westminster, for appellee.

Argued before MOYLAN, BLOOM and CATHELL, JJ.

CATHELL, Judge.

The underlying cause of this dispute is the inevitable conflict that results during the transition of a rural community to a suburban community. Circumstances which are accepted as natural and normal incidents of a rural society by those who are nurtured by an agrarian environment do not always match the expectations of bucolic life anticipated by suburbanites as they move out to the countryside. While new residents may well expect, and accept, vistas of

fields of waving grain, pastural scenes of dairy cattle on the hillside and the rustic ambiance of the pond and wetlands area in the meadows, they sometimes belatedly discover that the plow precedes the grain, manure accompanies the cattle, mosquitoes infest the ponds, and the products of the fields and animal husbandry must go to market. Since the advent of zoning, the conflicts between rural reality and suburban expectations have been refereed by zoning administrators who, all too often, have found themselves in the unenviable position of reconciling the irreconcilable.

The zoning law has attempted to serve as a mechanism for the resolution of these conflicts and to provide for an orderly process that recognizes the inevitable transition, while at the same time preserving and permitting the continuation of long-standing practices and customs. The relevant body of law governing this transition is the law of nonconforming, primary, accessory, and incidental uses. When the principles of this body of law are properly understood and applied by zoning administrators and ultimately by trial courts, the transition process is successfully managed. In this case, the trial judge clearly understood the process and correctly applied the law.

### The Facts

The dispute arises from the use of a 2.022 acre parcel of land in Carroll County, Maryland, which was zoned " 'A' Agricultural District." Since 1923, a bulk milk delivery, distribution and trucking business has been operating from the site serving the farming community.

Milk, unlike some agricultural products, is produced (harvested) every day. It is picked up by truckers who serve individual farms and collect their milk for transport to the dairies where it is processed. There is no respite from collection, because the cows take none from their production, and the product is perishable. In modern times this truck collection and delivery system is almost as important

as the cow.[1]

With the advent of zoning in Carroll County in 1965, the appellee's milk trucking and distribution business became a nonconforming use. As such, it was then, and is now, a lawful use. The business involves the operation of between 30 and 35 trucks per day from its site, all of which must be mechanically serviced on a regular basis. As new trucks are purchased, old trucks are retired. In order to facilitate maintenance, the decommissioned vehicles are stored on the site as a source of parts for the operable trucks. This cannibalization and repair program occurs incrementally, and results in the storage of parts as well as vehicles. To the casual passerby, perhaps to neighboring residents in search of rustic scenes to match their expectations, and occasionally to some zoning administrators, these vehicles and parts, or some of them, appear to be junk.[2]

---

1. In the first half of the century, many dairy farms processed their own milk and maintained house delivery routes serving individual residences. They were, in essence, "mom and pop" family operations. With population and economic growth, milk processing facilities became centralized in order to supply large concentrations of consumers via supermarkets, convenience stores, etc., as opposed to residential deliveries. In order to achieve the supply necessary for the demand, pickup systems came into use.

2. Various zoning complaint forms are contained in the extract. One, dated 4–28–71, states: "Nature of call 20–25 junk cars." It contains the notation "6–21–71 no improvement—don't see why he has to move them." It later states that they were moved to the back. Another, dated 4/2/85, says "untagged vehicles," and states that some of vehicles were for storage and company use and that one would be sold. A notice, dated 3/24/87, for the first time says "Junk Yard," describes in detail items on the property, and contains the notation that "many of the above vehicles & parts are used in the maintainance [sic] of there [sic] existing fleet, I advised of what the ord. allows & the policy of parts for other vehicles, I will get back to him after discussing w/the zoning ad....." Then, on the same date, a notice was sent to appellee ordering him to remove the vehicles and parts by 4/24/87, or risk receiving a violation notice. On 4/9/87, the same inspector sent a memo to the zoning administrator, which said "where do we draw the line on the amount of junk allowed to be kept in conjunction with a business?" On 6/11/87, appellee notified the zoning inspector that all vehicles had been removed except those used in business. On 9/19/88, an inspection report listed the items on the

The Carroll County ordinance attempts to regulate junk-yards. In 1988, the zoning office, and ultimately the Board of Zoning Appeals ("Board"), declared that the site was not a nonconforming junkyard because it had not registered and thus had not been "certified" as one under the ordinance. In essence, the zoning authorities were attempting to order the cessation or reduction of use of the outside portions of the property. There was no evidence which indicated that, at the time in question, greater use was being made of the property for storage, etc., than had previously been made.[3]

The Board upheld the administrator's decision. Appellee appealed the Board's decision to the circuit court, where it was heard by Judge Burns. In a short but well-reasoned memorandum opinion, he cut to the heart of the matter and reversed the Board. The County Commissioners of Carroll County appealed to this Court.

Judge Burns stated, in part:

As all parties know this family-owned business has a long history in Carroll County and it is undisputed that it is a lawful non-conforming use within this zone. Prior to 1987/1988 Appellant's storage of these vehicles in question, incidental to the business, was not seen as a "junk-yard" under the Zoning Ordinance. We cannot condone changing the standard now and considering this incidental use of the otherwise valid business (non-conforming use) a "junkyard" when there is no substantial evidence to

---

site concluding with the phrase "[a]cording [sic] to the Zoning Admin-istrator they may keep 4 or 5 trucks for parts." On 9/28/88, the zoning inspector notified the appellee of a violation, accusing him of operating a junkyard. The decision was appealed and resulted in the case before us.

**3.** There was some evidence that, on occasion over the years, some vehicles and items not adaptable to use in the business of the trucking firm had found their way on the site. The evidence indicated that this had been mostly corrected when brought to the attention of the appellee in an effort to avoid conflict with the authorities.

support said determination. Therefore, the Board's decision is not "fairly debatable" and cannot be affirmed.

We are persuaded by the case law cited by Appellant's counsel, specifically *Atkins v. Zoning Board of Adjustment,* [53 N.C.App. 723] 281 S.E.2d 756, (N.Car.1981). Additionally, we note that this has always been an incidental part of this business. That such storage now becomes a violation creating a "junkyard," is a new interpretation by the County....

Because we agree with the trial judge, we will not address estoppel, nor discuss *Permanent Financial Corp. v. Montgomery Co.,* 308 Md. 239, 518 A.2d 123 (1986), cited by the parties. The Zoning Administrator's apparent strategy was to redefine the nonconforming milk distribution business as a junkyard, and then to terminate it, when in fact he had no administrative power to terminate the *milk distribution business* nor any proper incidental use of that business. Judge Burns saw beyond the junkyard label and correctly identified Zent's truck maintenance operation as a use incidental to the primary use authorized by the legal nonconforming use possessed by Zent.

The appellant raises two questions:

   I.  Whether the circuit court erred in applying the doctrine of equitable estoppel, where the evidence failed to establish that county officials ever approved the alleged zoning violation or caused the alleged violator to change his position in reliance upon the purported approval.

  II.  Whether substantial evidence supports the conclusion that appellee's practice of retaining inoperable, obsolete trucks and other items constitutes a junkyard.

For reasons which will become apparent, we shall not address the first question. Appellant's second question ignores the trial court's finding. We will address it only inferentially as we directly confront the real issues stated in appellee's brief:

I. Did the circuit court correctly determine that the incidental storage of material on appellee's site in connection with appellee's admittedly lawful non-conforming use was not a "junkyard"?

II. Is the incidental storage of material on appellee's property no more than an accessory use to the lawful non-conforming trucking business and not a principal "junkyard" use subject to the enforcement sought by appellants?

## The Law

The Court of Appeals, in discussing zoning ordinances generally, has said:

Such ordinances are in derogation of the common law right to so use private property as to realize its highest utility, and while they should be liberally construed to accomplish their plain purpose and intent, *they should not be extended by implication* to cases not clearly within the scope of the purpose and intent manifest in their language.

*Landay v. Bd. of Zoning Appeals,* 173 Md. 460, 466, 196 A. 293 (1938) (citation omitted, emphasis added). *See also Aspen Hill Venture v. Mont. Co.,* 265 Md. 303, 313–14, 289 A.2d 303 (1972); *Canada's Tavern, Inc. v. Glen Echo,* 260 Md. 206, 218, 271 A.2d 664 (1970); *Gino's of Md., Inc. v. Mayor of Baltimore City,* 250 Md. 621, 642, 244 A.2d 218 (1968); *Norwood Heights Improvement Ass'n v. Baltimore,* 191 Md. 155, 163, 60 A.2d 192 (1948) (Henderson, J., dissenting). We said in *Lone v. Montgomery Co.,* 85 Md. App. 477, 494–95, 584 A.2d 142 (1990), "Zoning is an exercise of the police power and, to be valid, must be in the general public interest for promotion of health, safety or general welfare of the community. It is an exercise of the police power which takes away, for public good, some rights of individuals to use their property as they please while giving them rights to restrict injurious uses of others' property." (Citations omitted.)

In *Lone*, we discussed the concept of nonconforming uses:

> An owner of land may establish a "lawful nonconforming use" if the evidence conclusively establishes that before and at the time of the adoption of the original zoning ordinance, he was using substantially all of his tract of land in a then-lawful manner for a use which by a later legislative action became nonpermitted. *Board of Zoning Appeals of Howard County v. Meyer*, 207 Md. 389 [114 A.2d 626] (1955).

*Id.* 85 Md.App. at 496, 584 A.2d 142. *See also McKemy v. Baltimore Co.*, 39 Md.App. 257, 385 A.2d 96 (1978), for a discussion of scope.

In the case *sub judice*, the County has attempted to eliminate an incidental and accessory use, which is inherently attached to a nonconforming use, by the ploy of administrative redefinition.[4] It has not reduced the nonconforming use by statute or other proper regulation. The trial judge discerned this and, in an appropriate exercise of his discretion, corrected it.

### The Standards of Review

We discussed the standards for *judicial* review of zoning decisions in *Neuman v. Mayor of Baltimore*, 23 Md.App. 13, 325 A.2d 146 (1974), where we reversed the trial court's affirmance of a zoning agency.

> The general rule is that the action of a zoning board will not be reversed on appeal if there is "substantial evidence" in the record to support the board's finding. If such evidence does exist in the record, the matter is considered to be "fairly debatable", and the courts may

---

4. This Court held in *Nat'l Insts. of Health Federal Credit Union v. Hawk*, 47 Md.App. 189, 200, 422 A.2d 55 (1980): "Maryland case law permits continuing a non-conforming use, but does not permit the transmogrification of an approved non-conforming use into a new and different use." We believe it to be equally true that so long as a valid nonconforming use exists, it cannot normally be eliminated by a transmogrificational reinterpretation by administrative officials.

not substitute their judgment for that of the board.... On the other hand, where the action of the board is not supported by substantial evidence the board's decision cannot be said to be "fairly debatable". Under those circumstances the board's finding falls into the category of being arbitrary, capricious and a denial of due process of law.

*Id.* at 14, 325 A.2d 146.

■ We must, in order to assess a *trial court's* ruling, apply a different test. Judge Bishop, for this Court, restated that test in *Alston v. Alston,* 85 Md.App. 176, 184, 582 A.2d 574 (1990): "While the "clearly erroneous" standard applies to the court's findings of fact, the application of the law to the facts is judged on the abuse of discretion standard." *See also People's Counsel for Baltimore County v. Mangione,* 85 Md.App. 738, 584 A.2d 1318 (1990). We must thus apply both standards: (1) the fairly debatable standard in assessing the trial court's findings in respect to the agency decision, and (2) the abuse of discretion standard in respect to the trial court's conclusions.

Due to the trial court's conclusion that the use was incidental to the nonconforming use and thus was not a junkyard, it is necessary to review the law of extension, intensification, and incidental and accessory uses, all in relation to nonconforming uses. We first discuss the difference between extension and intensification.

## Extension–Intensification

■ The factors to be considered in determining whether an activity is within the scope of a nonconforming use are:

(1) to what extent does the current use of these lots reflect the nature and purpose of the original non-conforming use;

(2) is the current use merely a different manner of utilizing the original non-conforming use or does it constitute a use different in character, nature, and kind;

(3) does the current use have a substantially different effect upon the neighborhood;

(4) is the current use a "drastic enlargement or extension" of the original non-conforming use.

*McKemy,* 39 Md.App. at 269–70, 385 A.2d 96 (footnote omitted);[5] *Lone,* 85 Md.App. at 496–97, 584 A.2d 142.

In *Kastendike v. Baltimore Ass'n for Retarded Children, Inc.,* 267 Md. 389, 397, 297 A.2d 745 (1972), the Court was confronted with whether the change in use of a nonconforming facility from treating alcoholics and the elderly, to treating retarded adults, was a zoning violation, and found that it was not. We quoted from *Green v. Garrett,* 192 Md. 52, 63, 63 A.2d 326, *aff'd after remand,* 193 Md. 260, 66 A.2d 412 (1949), a case involving Memorial Stadium:

"The appellants contend that the enlargement of this use to include professional baseball games for a considerable period of a year is not within the exemption, but we cannot so find.... We have never held that the more frequent use of a property for a purpose which does not conform to the ordinary restrictions of the neighborhood is an extension of an infrequent use of the same building for a similar purpose...."

*Kastendike,* 267 Md. at 397, 297 A.2d 745. In *Kastendike,* we discussed the case of *Parr v. Bradyhouse,* 177 Md. 245, 9 A.2d 751 (1939), which held that a change of use from a "dairy business" to a riding academy was permitted and "that the change from cows to horses could not affect the right to use the land as a non-conforming use." *Id.* 267 Md.

---

**5.** We said in *Prince George's Co. v. E.L. Gardiner, Inc.,* 47 Md.App. 471, 424 A.2d 392 (1981), *rev'd on other grounds,* 293 Md. 259, 443 A.2d 114 (1982), that:

"A distinction is to be drawn between the enlargement or extension of non-conforming uses and an intensification of such lawful uses. An increase in floor space ... an increase in the area of a lot used for non-conforming uses; or a change in business methods or the provision of new accessory facilities with the resulting extension of the use involved have all been held to be proposals for the enlargement of a non-conforming use. Conversely, an increase in the volume of an existing business is usually referred to as an intensification rather than an enlargement and such an intensification has been permitted under a valid non-conforming use."

*Id.* 47 Md.App. at 476, 424 A.2d 392.

at 398, 297 A.2d 745. *See Kent Co. Planning Inspector v. Abel & Abel*, 246 Md. 395, 405, 228 A.2d 247 (1967) (property owner may intensify a nonconforming use); *Helfrich v. Mongelli*, 248 Md. 498, 504, 237 A.2d 454 (1968) ("The changes in Ridgeway Inn, an already nonconforming use, consisted primarily of enclosing the porch. This amounts to no more than a permissible intensification of an existing nonconforming use and hardly amounts to a change that would affect the character of the neighborhood.") (Footnote omitted.)

A legal nonconforming junkyard was at issue in *Feldstein v. LaVale Zoning Bd.*, 246 Md. 204, 227 A.2d 731 (1967). The yard was being used more frequently than before, and the height of the junk piles had been increased. The applicable statute prohibited the extension of a nonconforming use. The court discussed the difference between an extension and an intensification:

> The zoning ordinance ... provides that a nonconforming use shall not be extended, but that does not mean that the vested nonconforming use of the junkyard owner could not be lawfully intensified. The chancellors held that the increase in the quantity and height of the stored scrap metal was an intensification and not an extension under the law. We agree.... While a nonconforming use should not be extended or perpetrated longer than necessary, the more frequent present use of property for the same or a similar use than that for which it had been used less frequently theretofore was held to be an intensification and not an extension....

*Id.* at 211, 227 A.2d 731 (citations omitted). *See also Wilson v. Mayor and Comm'rs of the Town of Elkton*, 35 Md.App. 417, 426, 371 A.2d 443 (1977) ("Distinguished from a prohibited *extension* of a non-conforming use is what the courts look upon as a mere intensification of the existing lawful use.") (Emphasis in original.) *But see Phillips v. Zoning Commission*, 225 Md. 102, 110, 169 A.2d 410 (1960).

The Court in *Jahnigen v. Staley*, 245 Md. 130, 225 A.2d 277 (1967), was faced with at least two issues: the property

owner's construction of extensive dockage additions, and a large increase in the number of rental boats, both in a nonconforming marina. While upholding the trial court's finding that the additional dockage was an invalid extension, the Court held, with respect to the boats, that:

> [W]e hold that the rental of rowboats can not be so limited. Any increase in the number of rowboats rented would be an intensification of non-conforming use and would not be an extension.

> \* \* \* \* \* \*

> We affirm the decree of the chancellor in all respects *except* that portion thereof which restricted the rental ... to the seven rowboats ... which is modified so as to permit the rental of rowboats which appellants might own and the storage, repair, and maintenance of those rowboats.

*Id.* at 138–39, 225 A.2d 277 (citations omitted, emphasis added). In *Nyburg v. Solmson,* 205 Md. 150, 161, 106 A.2d 483 (1954), a nonconforming use for the operation of a garage, storing of cars, sale of gasoline was expanded to include storage of *new* cars prior to shipment to new car distributors. The Court stated: "We think that ... here there is not an extension but merely an intensification of a long continued non-conforming use." *But see Dampman v. Mayor of Baltimore,* 231 Md. 280, 286, 189 A.2d 631 (1963).

Other jurisdictions have expanded upon the intensification theory. In *Appeal of Suburban Gen. Hosp.,* 48 Pa. Cmwlth. 273, 410 A.2d 85 (1980), a nonconforming helicopter pad which was incidental to the operation of a hospital was at issue. The precise issue concerned additional paving and lighting of the pad. The Court stated: "Once we perceive that a nonconforming use exists, 'a nonconforming use cannot be limited by a zoning ordinance to the precise magnitude thereof which existed at the date of the ordinance.'" *Id.* 410 A.2d at 88 (citation omitted). In *Silver v. Zoning Bd. of Adjustment,* 435 Pa. 99, 255 A.2d 506 (1969), the court voided a Philadelphia County ordinance which

prohibited any expansion of a certain nonconforming use and discussed the doctrine of "natural expansion" applicable in Pennsylvania:

> The doctrine of natural expansion was promulgated by this Court some forty years ago.

> \*     \*     \*     \*     \*     \*

> If a person owns property which constitutes a valid non-conforming use, it is inequitable to prevent him from expanding the property as the dictates of business or modernization require.... [W]e must conclude from the tenor of these decisions that the right of natural expansion is a constitutional right protected by the due process clause.[6]

*Id.* 255 A.2d at 507 (footnote omitted). *But see Appeal of Ferraro,* 174 Pa.Super. 570, 102 A.2d 186 (1954) (land owner's request to operate a machine shop on premises, where he had a valid nonconforming use for a delivery business including the repair of delivery trucks, was rejected); *Firth v. Scherzberg,* 366 Pa. 443, 77 A.2d 443 (1951).

The business being operated in the case at bar is exactly the same business being operated at the time of the enactment of the ordinance, and it is being operated on the same land. There has been little, if any, measurable increase in the degree or intensity of the operation. The evidence indicates that there had been constant storage of items outside, which were adjunct to the repair phase of the business at issue, prior to the enactment of the ordinance.

There is little, if any, evidence that there had been an increase in use amounting to an illegal extension. To the extent there was any evidence of an increase in use, that increase would be an intensification. There was thus insuf-

---

6. We have not unearthed any Maryland cases that have explicitly recognized the "doctrine of natural expansion." We first note that the name is an especially congruous description of the principle. We do not further address that doctrine, though we acknowledge that its basic premise appears consistent with the Maryland theory of "intensification."

ficient evidence to make the issue fairly debatable. Accordingly, when the trial judge found that the administrator had *mistakenly* concluded as a *matter of law* that the incidental use of the property ancillary to the milk distribution business was a junkyard, he was correct. The administrator's decision was clearly arbitrary and capricious. We further explain.

## Accessory Use

■ In general, an accessory use is regarded as "a use which is dependent on or pertains to the principal or main use." (Footnote omitted.) 82 Am.Jur.2d, *Zoning and Planning* § 169 (2d ed. 1976) (footnote omitted).[7] In *Kowalski v. Lamar*, 25 Md.App. 493, 499, 334 A.2d 536 (1975), we relied on cases from foreign jurisdictions to determine that the use there questioned was not an accessory use. We cited *Town of Harvard v. Maxant*, 360 Mass. 432, 275 N.E.2d 347, 349–50 (1971); *Williams v. City of Bloomington*, 108 Ill.App.2d 307, 247 N.E.2d 446, 449–50 (1969); *Samsa v. Heck*, 13 Ohio App.2d 94, 234 N.E.2d 312, 315–16 (1967); *Silver*, 112 A.2d at 86–87; and *City of Warwick v. Campbell*, 82 R.I. 300, 107 A.2d 334, 336–37 (1954). We cited no Maryland authority. *Kowalski* has not since been cited by the Maryland appellate courts.

While at first glance, our recent case of *Co. Comm'rs of Carroll County v. Uhler*, 78 Md.App. 140, 552 A.2d 942, *cert. denied*, 316 Md. 428, 559 A.2d 791 (1989), appears to be similar to the issues now raised by appellant, it is, in fact, quite different from the issues resolved by the trial court. The issue there was whether or not a certification for a junkyard had been obtained. The equipment stored there was found to have been abandoned and was not used in the operation of a conceded legal nonconforming use. In the present case, there is no dispute as to the existence of

---

**7.** *See also Urban v. Planning Bd. of the Borough of Manasquan,* 238 N.J.Super. 105, 569 A.2d 275, 278 (1990) ("An accessory use is one which is customarily incidental and subordinate to the principal use of the property.")

the primary nonconforming use. A review of that case indicates no citing of any Maryland authority defining incidental or accessory uses.

The Court of Appeals in *Arundel Supply Corp. v. Cason*, 265 Md. 371, 289 A.2d 585 (1972), stated that washing, screening, and batching were not accessory uses of a nonconforming gravel pit, because a 1949 ordinance specifically required a special use permit for such activities. No Maryland cases were cited, nor were any definitions of accessory or incidental use given in the body of the opinion, though the headnote seems to indicate their presence. *Arundel* appears never to have been subsequently cited in respect to its "accessory use" finding.

From our review, we perceive a paucity of Maryland cases defining accessory uses, incidental uses, and their *relationship* with legal primary uses, whether the primary uses be permitted uses or legal nonconforming uses.[8] As to that *relationship*, we do not discern any distinction whether the primary use is "permitted" or legally "nonconforming."[9]

We will therefore extensively review the cases and authorities from without the state.[10] Because we agree with

---

**8.** There are some cases defining accessory buildings. *See, e.g., Carney v. City of Baltimore*, 201 Md. 130, 136, 93 A.2d 74 (1952). The instant case concerns uses, not structures.

**9.** Generally there are two types of zoning ordinances—"permissive" and "prohibited." In the former, the ordinance lists the uses permitted and all else is prohibited. In the latter, the ordinance lists prohibitions, and all else is permitted. Both types generally also provide for the continuation of nonconforming uses. Permissive ordinances, such as Carroll County's, are the most common.

**10.** We have reviewed the Maryland case law for cases dealing with incidental and accessory uses and their relationship to primary permitted or legal nonconforming uses. With the few exceptions we have noted, we have not found any clear definitive discussions. In our review, we have considered the Maryland cases cited by the parties which, in addition to those mentioned above, include: *Inlet Assoc. v. Assateague House Condominium Ass'n*, 313 Md. 413, 545 A.2d 1296 (1988) (conveyance of public streets and estoppel); *Dickinson–*

the trial judge in the case at bar, we shall focus on similar cases from foreign jurisdictions. We will, by way of a footnote, provide a listing of authorities to the contrary. To aid in our discussion, we shall categorize the cases by the types of accessory uses and furnish illustrative examples. These categories are necessarily broad in nature and are accessory uses in the (a) transportation/service area; (b) residential area; (c) manufacturing/construction area; and (d) agricultural area.

## A. Transportation/Service Industries

In a case involving a warehouse distribution operation, the Appeals Court of Massachusetts discussed the accessory nature of vehicle storage and maintenance:

> [W]e do not agree with the board that, as a matter of law, the garage and storage of vehicles are not permitted as accessory uses.... Uses such as those proposed by the plaintiff have, without detailed analysis of the facts, been held to be accessory.

*Salah v. Bd. of Appeals of Canton,* 2 Mass.App. 488, 314 N.E.2d 881, 886 (1974) (citations omitted). The property owners in *McGeehan v. Zoning Hearing Bd. of Springfield Township,* 45 Pa.Cmwlth. 403, 407 A.2d 56 (1979), had been operating a junkyard on 13 of their 30 acres prior to the

---

*Tidewater, Inc. v. Supervisor of Assessments of Anne Arundel Co.,* 273 Md. 245, 329 A.2d 18 (1974) (taxation); *Coerper v. Comptroller of the Treasury,* 265 Md. 3, 288 A.2d 187 (1972) (statutory construction—taxation); *City of Hagerstown v. Long Meadow Shopping Center,* 264 Md. 481, 287 A.2d 242 (1972) (estoppel); *Eger v. Stone,* 253 Md. 533, 253 A.2d 372 (1969) (granting of special exception); *Gino's of Maryland v. Mayor of Baltimore,* 250 Md. 621, 244 A.2d 218 (1968) (zoning ordinances to be strictly construed); *Bd. of Co. Comm'rs of Prince George's Co. v. Oak Hill Farms, Inc.,* 232 Md. 274, 192 A.2d 761 (1963) (rezoning); *Town of Berwyn Heights v. Rogers,* 228 Md. 271, 179 A.2d 712 (1962) (long-continued administrative practice and estoppel); *Snowden v. Mayor of Baltimore,* 224 Md. 443, 168 A.2d 390 (1961) (height exception and estoppel); *Harford Co. v. McDonough,* 74 Md.App. 119, 536 A.2d 724 (1988) (abandonment of a nonconforming use); *Kassab v. Burkhardt,* 34 Md.App. 699, 368 A.2d 1064 (1977) (the interpretation of a statute is a matter of law). None of these cases address the issue which resulted in the trial court's finding, i.e., that the use complained of was incidental or accessory to a legal nonconforming primary use.

enactment of the zoning ordinance. They requested permission to erect a trailer office to replace an existing office. The adjacent property owners contended that the erection of the trailer violated the ordinance in that it was a nonconforming accessory use. The court stated:

> Pennsylvania law affords reasonable and natural expansion of a nonconforming use due process protection. Absent evidence that the expansion ... represents such a change in volume or degree so as to represent a change in the protected nonconforming use itself, or evidence that the proposed *expansion* is, in and of itself, injurious to the public interest, reasonable expansion of the nonconforming junkyard use, short of the township's 50% limitation on expansion, may not be impeded.

*Id.* 407 A.2d at 60 (citations omitted, emphasis in original).

The primary issue in *Ferry v. City of Bellingham,* 41 Wash.App. 839, 706 P.2d 1103 (1985), was whether a crematory was a valid accessory use of a funeral home. The court stated:

> Whether a use is viewed in the perspective of a presently permitted use or of a use required to be permitted despite a present prohibition in the ordinance, there is no difference as to the extent to which it can be supplemented by customary accessory uses. The exercise of the right to engage in such an accessory use does not constitute a prohibited change of use where the accessory use does not achieve the status of an additional co-equal use but remains subordinate to the previously existing non-conforming use in scale, volume, and intensity.

>           *    *    *    *    *    *

> Because the operation of the crematory was valid as an accessory use, it did not constitute an enlargement of a nonconforming use.

*Id.* 706 P.2d at 1107 (quoting 4 A. Rathkopf & D. Rathkopf, *Zoning & Planning* § 51.01[3] (4th ed. 1985)). The Supreme Court of New Jersey has similarly held that a

crematorium is an accessory and incidental use to a funeral business: "There are some general principles to be garnered: (1) It is not essential to the concept of 'customarily incident' that a majority or even a substantial percentage of a given type of principal use should in fact be accompanied by the mooted accessory use; (2) courts have classified uses as accessory uses even though they were not strictly 'necessary' to the fulfilment of the permitted use." *Laurel Lawn Cemetery Ass'n v. Zoning Bd. of Adjustment,* 226 N.J.Super. 649, 545 A.2d 253, 254 (1988) (citation omitted).

While not being able to decide the issue because of the state of the record, the Supreme Court of Louisiana in *Redfearn v. Creppel,* 455 So.2d 1356 (La.1984), held that ordinances authorizing accessory uses normally require the use to meet the following tests:

1.  They must be related to the principal use (usually not explicitly stated, but implied).
2.  They must be subordinate and clearly incidental to the principal use (almost always stated).
3.  They must also be *customarily* incidental (almost always stated).
4.  They must be located on the same lot as the principal use (almost always stated)—and, occasionally, must also be in the same ownership.
5.  They must not alter the character of the area or be detrimental thereto (occasionally stated).

Applying these precepts, we conclude that bar and meeting room uses of the property can be classified as accessory uses of the hotel and restaurant if they meet *all* of these tests....

*Id.* at 1360 (emphasis in original, citation omitted).

## B.  Residential Area

In the vending machine case of *City of Newark v. Daly,* 85 N.J.Super. 555, 205 A.2d 459, 462 (1964), the court stated:

To refer to a particular use in a residential district as a "business use" is not *per se* sufficient to stamp it as a violation of a zoning ordinance....

      *      *      *      *      *      *

The use of the word "customarily," when applied to "incidental," may be helpful to establish affirmatively the existence of a use as "accessory." But the fact that a use is not "customarily" indulged in is not conclusive.

In Illinois, an intermediate appellate court ruled that a for-profit restaurant serving alcoholic beverages was not a permitted accessory use incidental to the operation of an office complex. The decision was based primarily on the lack of specific factual support in the record to establish that such a use was customary, but the court nevertheless set forth a clear standard:

[A]n accessory use must be customarily incidental to the principal use, serving no other principal use, and must be subordinate in area, floor area, intensity, extent, and purpose to the principal use. It is required to contribute to the comfort, convenience, or necessity of users of the principal use.

*Tollway North Office Ctr. Cent. Nat'l Bank in Chicago v. Streicher*, 83 Ill.App.3d 239, 38 Ill.Dec. 642, 645, 403 N.E.2d 1246, 1249 (1980). The property owner in *Holcomb v. City of Denver*, 199 Colo. 251, 606 P.2d 858, 863 (1980), kept 12 dogs at his home. It was alleged by the zoning administrator that the number of dogs violated the zoning ordinance. The Colorado Supreme Court stated: "[B]oth parties concede that the ownership and possession of dogs is incidental to and customary to the occupancy and the use by right of an R–1 district." [11]

In *Markley v. Carlisle Zoning Hearing Bd.*, 106 Pa. Cmwlth. 578, 527 A.2d 595 (1987), it was proposed that chronic psychiatric patients be housed in individual apart-

---

11. The Colorado court further found that the administrator had no power to regulate the number of dogs kept on the premises.

ments in a nonconforming use apartment building. The staff members were to utilize separate apartments in that building as offices. It was contended that the nonconforming use was limited to the operation of a regular apartment house, and that housing patients violated that use. The court found that as each individual patient lived independently of the others, the nonconforming use had not been violated. The court remanded to the trial court for a determination as to whether the staff apartments were accessory to the primary use of the apartment building: "Accordingly, we must remand for findings of fact as to whether (1) the staff unit constitutes an "office", and if so, (2) whether that use is "clearly incidental to", and (3) "customarily found in connection with", an apartment building...." *Id.* 527 A.2d at 599 (footnotes omitted).

## C. Manufacturing/Construction Area

The Supreme Court of New Jersey, in reversing the denial of a heliport as an accessory use for a construction company, said in *New Jersey v. P.T. & L. Constr. Co.*, 77 N.J. 20, 389 A.2d 448 (1978):

In analyzing whether a use is customarily incident to the permitted use, two determinations must be made. The first is whether the use is *incidental* to the main use: does the use "* * * bear a close resemblance and obvious relation to the main use to which the premises are put"? Second, it must be determined whether a use which is found to be incident to the permitted use is also a customary use. Generally, a use which is so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it will be found to be a customary use. The fact that a use is not customarily indulged in, however, is not conclusive, and even if the use in question is found in a small percentage of similar main uses, the use may still be found to be "customary."

*Id.* 389 A.2d at 451 (citations omitted, emphasis in original). In concluding its discussion of accessory use, the court held:

If the conditions and situation of a particular municipality lead its governing body to believe that tighter restrictions than those before us in this case are reasonably necessary or desirable, it is free so to provide in its ordinance.

We thus approve the determination of the county court concerning the permissibility of the defendant's helistop as an accessory use of the property in question under the Paramus zoning ordinance.

*Id.* at 453 (footnote omitted).

### D.   Agricultural Area

In the context of a plant nursery operating out of a residential district, the Supreme Court of Massachusetts held that an incidental use did not include the maintenance of vehicles which were not used in the nursery business itself:

An incidental or accessory use under a zoning law is a use which is dependent on or pertains to the principal or main use.

\*       \*       *       \*       \*       \*

Doubtless the defendant may engage in landscaping as a part of the ... nursery.  It may enter into contracts for such work.  We think, however, its premises cannot be used as headquarters for a contracting business which does not concern the transplanting of the defendant's own nursery stock....   Such use exceeds what is reasonably accessory to its principal business, as does the maintenance of the premises of more trucks than are necessary for the delivery of its own products.

*Town of Needham v. Winslow Nurseries*, 330 Mass. 95, 111 N.E.2d 453, 457–58 (1953).

In discussing the construction of a commercial greenhouse in an agricultural district, a Pennsylvania court noted that "[w]hen an ordinance permits an owner to use his property as a farm, the ordinance by necessary implication permits the use of the lot for such agricultural specialties as its size will permit." *Klavon v. Zoning Hearing Bd.*, 20 Pa.Cmwlth. 22, 340 A.2d 631, 634 (1975) (quoting *Klein*

*Appeal,* 395 Pa. 157, 149 A.2d 114, 116 (1969) (brackets in original, citation omitted). The Court went on to state: "[T]he accessory use doctrine is, in essence, only an acknowledgement that certain general types of real estate usage have a natural and reasonable tendency to lead to certain other more specific uses." *Id.* 340 A.2d at 634. In discussing another case, the *Klavon* court stated: "The Court held, in effect, that this argument [that a variance authorized the use] drew an artificial distinction between nonconformance cases and other situations where the natural expansion of a land use involved has been customarily termed an 'accessory use.'" *Id.* at 634.

The case of *Atkins v. Zoning Bd. of Adjustment,* 53 N.C.App. 723, 281 S.E.2d 756 (1981), involved an increase in use by a landowner. The property was being used for the storage and sale of grain, fertilizer and lime, and for seed cleaning. As to those uses, he had a valid nonconforming business. The proprietor delivered the lime throughout Tennessee, and decided that he would also stockpile sand, rocks, and lumber on the site, so as to carry them with him on lime deliveries and sell them along his route. The zoning board had authorized him to store sand and gravel and to transport sand, gravel, and lumber if those products were sold in conjunction with the hauling of grain, lime, and fertilizer. This was allowed to avoid "deadheading." The Court said:

> Under the Doctrine of Accessory Uses, a landowner is permitted to maintain an accessory or incidental use in connection with a permitted use of land *if the accessory use is truly incidental* to the primary nonconforming use and does not change the basic nature of the use of property. Given the nature of Rape's agricultural service business, we are not convinced that the stockpiling or transportation of sand, gravel or lumber is incidental to any use of Rape's property permitted by the Ordinance.[12]

---

12. There were other issues in *Atkins* which we need not address.

*Id.* 281 S.E.2d at 760 (citations omitted, emphasis added).[13]

## Conclusion

One of the most restrictive definitions of "accessory use" is that found in *Lawrence v. Zoning Bd. of Appeals of the North Branford,* 158 Conn. 509, 264 A.2d 552 (1969):

The ordinance in question defines an accessory use as one which is subordinate and customarily incidental to the

---

**13.** As to other cases finding accessory uses, see *Hinkle v. Board of Zoning Adjust. & App. of Shelby Co.,* 415 S.W.2d 97 (Ky.1967); *Silliman v. Falls City Stone Co.,* 305 S.W.2d 322 (Ky.1957) (the Court of Appeals of Kentucky held that an asphalt plant was an incidental and customary accessory use to a large nonconforming rock quarry); *Superintendent & Inspector of Bldgs. of Cambridge v. Villari,* 350 Mass. 176, 213 N.E.2d 861 (1966); *State v. Smiley,* 182 Neb. 211, 153 N.W.2d 906 (1967) (the rental of cargo trailers, where the income was minor compared to the service station's other income, was held to be an accessory use customarily incident to the primary service station use); *Dettmar v. County Bd. of Zoning Appeals,* 28 Ohio Misc. 35, 273 N.E.2d 921, 922 (1971); *Lawrence v. Zoning Bd. of Lower Gwynedd Township,* 19 Pa.Cmwlth. 128, 338 A.2d 779 (1975) (boarding of dogs a continuation of prior nonconforming use involving occasionally boarding of dogs in connection with breeding); *Gross v. Zoning Bd. of Adjustment of City of Philadelphia,* 424 Pa. 603, 227 A.2d 824 (1967) (a restaurant was determined to be an "accessory use" of a bowling alley, where the evidence showed a large percentage of bowling alleys customarily had restaurants); *City of Warwick v. Campbell,* 82 R.I. 300, 107 A.2d 334 (1954) (defining accessory use).

As to cases not finding accessory uses see *Wundsam v. Gilna,* 97 Ill.App.3d 569, 52 Ill.Dec. 900, 907, 422 N.E.2d 1109, 1116 (1981) (storage of recreational vehicle in residential zone not incidental or accessory to residential use); *City of Middlesboro v. Billingsley,* 371 S.W.2d 23 (Ky.1963); *Building Inspector of Groton v. Vlahos,* 10 Mass.App. 890, 409 N.E.2d 795 (1980); *City of Lincoln v. Bruce,* 221 Neb. 61, 375 N.W.2d 118 (1985); *Charlie Brown of Chatham, Inc. v. Board of Adjustment for the Township of Chatham,* 202 N.J.Super. 312, 495 A.2d 119 (1985) (sleeping quarters for restaurant employees not customarily incidental); *Heagen v. Borough of Allendale,* 42 N.J. Super. 472, 127 A.2d 181 (1956); *Medford Assembly of God v. City of Medford,* 72 Or.App. 333, 695 P.2d 1379, *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 554 (1985); *Clackamas County v. Portland City Temple,* 13 Or.App. 459, 511 P.2d 412 (1973); *IMS American, Ltd. v. Zoning Hearing Bd.,* 94 Pa.Cmwlth. 501, 503 A.2d 1061 (1986) (car wash not invariably an accessory use to a service station so as to justify the extension of the nonconforming use); *Green v. Zoning Bd. of Adjustment of Pittsburgh,* 88 Pa.Cmwlth. 469, 490 A.2d 488 (1985)

main building and use on the same lot. The crucial phrase "customarily incidental" is typically present in this type of legislation. . . .

\* \* \* \* \* \*

The word "incidental" as employed in a definition of "accessory use" incorporates two concepts. It means that the use must not be the primary use of the property but rather one which is subordinate and minor in significance. Indeed, we find the word "subordinate" included in the definition in the ordinance under consideration. But "incidental," when used to define an accessory use, must also incorporate the concept of reasonable relationship with the primary use. It is not enough that the use be subordinate; it must also be attendant or concomitant. . . .

The word "customarily" is even more difficult to apply. Although it is used in this and many other ordinances as a modifier of "incidental," it should be applied as a separate and distinct test. Courts have often held that use of the word "customarily" places a duty on the board or court to determine whether it is usual to maintain the use in question in connection with the primary use of the land. In examining the use in question, it is not enough to determine that it is incidental in the two meanings of that word as discussed above. The use must be further scrutinized to determine whether it has commonly, habitually and by long practice been established as reasonably associated with the primary use.

*Id.* 264 A.2d at 554 (citations omitted).

■ Addressing the facts in the case at bar and applying any of the definitions or tests we have described from other jurisdictions, including that mentioned in *Lawrence*, we are compelled to hold that the use described in the case at bar was attendant, concomitant, and customary to the primary use of the property. It was thus incidental to, or accessory

(dentist's office not accessory use to nonconforming apartments in the same building).

to, the primary nonconforming use. We hold that when a use does not change the basic nature of the primary permitted nonconforming use and is truly incidental to, and supports the nonconforming use, it is an accessory use and, unless expressly prohibited by statute, is permitted.

When Judge Burns opined that "there is no substantial evidence to support" a determination that the use of the property being complained of, had not predated the ordinance, and was not incidental to a valid nonconforming use, he was correct. There was no dispute that these activities had been occurring prior to the ordinance and that there had been little, if any, intensification since the advent of zoning in the County. Every iota of evidence before the agency, and thus reviewed by the court, supports, and supports only, a finding that the use was clearly incidental and accessory to the legal nonconforming use. Intensification of the use, if any, was clearly appropriate.[14] Appellant's administrative actions were therefore arbitrary and capricious. The use at issue was clearly an accessory use and incidental to the operation of the lawfully permitted milk distribution business. No other interpretation of the evidence is logically supportable. We hold that the trial judge did not abuse his discretion. Accordingly, we shall affirm.

---

**14.** There was only minimal and insubstantial evidence that any of the parts were used outside appellee's business. This was introduced primarily in response to questions concerning the valuation placed on the items by appellee. Appellee at one point stated:

A I placed those values on what they would be worth if we had to go out and buy it or get somebody to come in and wanted a piece to sell [buy], that's what we would ask for it. . . . We don't normally do this. We try to keep that stuff for our own use.

Q If somebody came in, would you sell it?

A . . . [I]f someone came in that we know. But . . . to the public, no, but to one of our farmers that we do business with . . . [who] need[ed] a wheel . . . we would let him have it. But we are not open to buy or sell with the general public. . . .

We fail to see where an accomodation sale to farmer clients of the milk distribution business in an agricultural community would constitute a junk sale in the nature of "junkyard" sales generally.

With our decision, we do not mean to say that the County cannot, in time, reduce or limit this, or any other use, provided it does so in a reasonable exercise of the police powers and does so in a manner properly recognizing property rights. *See Lone,* 85 Md.App. 477, 584 A.2d 142. As we indicated in *Lone,* and as Maryland's appellate courts have stated in a line of cases involving billboards (and even in junkyard cases), there are appropriate methods for eliminating nonconforming uses,[15] but terminating nonconforming property rights by bureaucratic redefinition is not one of them. This type of decision, fraught as it is with the emerging conflicts between the vanishing agricultural character of the County and its emerging suburban character, is a policy-making decision best made in an arena permitting full public debate by policy-makers—the elected representatives—not by the professional planners and zoners who *only* apply that policy.

As we affirm the trial court's ruling that the uses were incidental (and accessory) to a primary legal nonconforming use, we do not address the remaining issues.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.

---

**15.** There are provisions relating to amortization, destruction of the use, obsolesce, or abandonment which are commonly extant in zoning ordinances.