LEON McKEMY ET AL. *v.* BALTIMORE
COUNTY, MARYLAND

[No. 948, September Term, 1977.]

*Decided April 14, 1978.*

258

■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■

The cause was argued before MORTON, MELVIN and WILNER, JJ.

*Walter I. Seif, Jr.,* for appellants.

*Peter Max Zimmerman, Assistant County Solicitor for Baltimore County,* with whom were *J. Carroll Holzer, County Solicitor,* and *Julius W. Litchter, Assistant County Solicitor,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

Gertrude Stein once said that a rose is a rose is a rose, and no one appealed. Here, the Circuit Court for Baltimore County has held that a parking lot is a parking lot is a parking lot, and both sides have appealed. As a result, we are asked to determine whether Leon McKemy (t/a M & M Fuel Co., Inc.) may continue to use certain lots in the Sparrows Point area of Baltimore County in the way he heretofore has used them. The Zoning Commissioner said that some of the lots could not be used at all for such purposes and set certain conditions and limitations on the continued use of others. The county Board of Appeals affirmed those determinations, as did the Circuit Court.

The lots in question are identified as Lots 378 through 387 and Lot 442, as shown on the Plat of Sparrows Point Manor. They are located on the south side of Snyder Avenue between Marine Avenue and Sparrows Point Road, and are (and since 1945 have been) zoned for residential use. It is undisputed that the operations being conducted on those lots are not permitted under the zoning regulations applicable to residential zones. Thus, if McKemy is to be allowed to continue using the lots for such purposes, it must be by virtue either of a valid pre-existing non-conforming use or because

of a 1976 county ordinance (Bill 18-76) regulating truck terminals. These, then, are the central issues before us:

(1) Are the current uses made of the lots by McKemy within the scope and protective ambit of a valid non-conforming use; and

(2) What, if any, effect does Bill 18-76 have?

Complicating the first issue somewhat is the fact that the Board of Appeals considered that issue once before, in 1969, and made a determination then that was not appealed. In addressing the first issue, therefore, we are asked to consider whether, and to what extent, the principle of *res judicata* operates with respect to the 1969 Board decision.

## I. *Non-Conforming Use*

Zoning came officially to Baltimore County on January 2, 1945, when, pursuant to previous authorization by the General Assembly, the County Commissioners adopted a comprehensive set of zoning regulations.[1] Section II of those regulations created seven zones — four being residential, one commercial, and two industrial. The lots in question here were zoned for residential use.

Section XI of these original regulations provided for non-conforming uses. It stated:

"A lawful non-conforming use existing on the effective date of the adoption of these regulations may continue, provided, however, upon any change from such non-conforming use to a conforming use, or any attempt to change from such non-conforming use to a different non-conforming use or any

---

1. The Commissioners were first authorized to adopt comprehensive planning and zoning regulations in 1939 (Laws of Md., 1939, ch. 715). At the next biennial session of the General Assembly, this authorization was repealed, and a new authorization was enacted (Laws of Md., 1941, ch. 247). Before any such regulations were issued, the Legislature authorized the Commissioners to make special exceptions to the regulations (Laws of Md., 1943, ch. 877). The first regulations were adopted and took effect on January 2, 1945. *See* Kahl v. Cons. Gas El. Lt. & Pwr. Co., 191 Md. 249, 254 (1948); Calhoun v. County Bd. of Appeals, 262 Md. 265 (1971).

discontinuance of such non-conforming use for a period of one year . . . the right to continue to resume such non-conforming use shall terminate, provided, however, that any such lawful non-conforming use may be extended or enlarged to an extent not more than once again the area of the land used in the original non-conforming use."

On March 30, 1955, the County Commissioners adopted a new set of comprehensive zoning regulations. Non-conforming uses are dealt with in Section 104, which provides in relevant part:

"A lawful nonconforming use existing on the effective date of the adoption of these regulations may continue; provided that *upon any change from such nonconforming use to any other use whatsoever* . . . the right to continue *or* resume such nonconforming use shall terminate. No nonconforming building or structure and no nonconforming use of a building, structure, or parcel of land shall hereafter be extended more than 25% of the ground floor area of buildings so used." (Emphasis supplied.)

It was within this legal framework that the activities of Mr. McKemy first came to the attention of the county zoning authorities. In February, 1969, apparently upon a complaint filed by one or more residents in the area, the Zoning Commissioner conducted a hearing to determine whether the property located at the "northwest corner of Sparrows Point Boulevard and Snyder Avenue" and Lots "Nos. 378, 381 and 384" were being used in a manner violative of the existing zoning regulations. The Commissioner concluded that the first of these properties — that on the north side of Snyder Avenue — enjoyed a non-conforming use as a service garage, and could continue to be used for that purpose. The three lots across the street, however (Nos. 378, 381, and 384), he concluded were not part of that garage business and therefore had no non-conforming use status for the parking of vehicles in conjunction with the garage business. On that

premise, he ordered that all vehicles connected with McKemy's fuel service use of the garage property be removed from those lots.

On appeal, the Board of Appeals reversed the latter determination in an opinion that is hardly a model of clarity. The Board first stated that the case came before it on appeal from a finding by the Zoning Commissioner "that the property situated at the northwest corner of Sparrows Point Boulevard and Snyder Avenue is being used in violation of the Zoning Regulations of Baltimore County in that the respondent ... is using the property in question for the parking of automobiles." This is manifestly *not* what the Zoning Commissioner held. As noted, he concluded that the property at the "northwest corner" of those two streets was *not* in violation of the regulations because *it* enjoyed a non-conforming use. It was the property across the street (which would have been the southwest corner) where the violation existed, and the violation did not consist of the "parking of automobiles", but rather the parking of fuel oil trucks.

These apparent misperceptions were perhaps cured by stipulation. First, the county and McKemy stipulated that the property at the northwest corner was being used as a garage for the repair of automobiles and trucks, and that it enjoyed a valid non-conforming use for that purpose. In effect, the Zoning Commissioner's determination as to that property was stipulated to be correct. It was further stipulated that Lot No. 442 and "Lots Nos. 378 through 384" were zoned residential and "are being used for the parking of trucks and other vehicles in conjunction with a fuel oil business operated by" McKemy.[2]

2. In the 1969 proceeding, McKemy was referred to as "Leon McKenney". They appear to be the same person. There is no explanation of the fact that the Zoning Commissioner seemed to be dealing with Lots Nos. "378, 381, and 384", whereas the Board was dealing with Lots. Nos. "378 through 384". The disparity, of course, involves the status of Lots Nos. 379, 380, 382, and 383, which are separately identified on the Plat of Sparrows Point Manor. The Circuit Court, without explanation, stated that the "subject property" in the 1969 decision involved the property at the northwest corner and Lots 442, 378, 379, 380, 381, 382, 383, and 384. Neither party has raised an issue as to this, so neither will we.

The Board summarized the testimony of two witnesses that appeared before it, upon which it evidently relied in making its decision. The first was Michael Narutowitz, who, through a corporation, "owns the property in question." [3] Narutowitz stated that he purchased the property in 1936 to be used "as a parking lot in conjunction with a restaurant and bar business" owned by him on the north side of Snyder Avenue.[4] He testified that such use continued until 1951, when he closed the restaurant and leased the property to a tenant who rented rooms to truckers, "and the lots in question were used for the parking of cars and trucks belonging to her roomers and others continuously until 1961." Since 1961, according to Narutowitz, "the property has been used continuously as a parking lot for vehicles and trucks used by Mr. McKenny in conjunction with his fuel oil business."

The second witness was J. Fred Welsh, Sr., who testified that "the lots in question have been used continuously as a parking lot for trucks and cars since about 1936." After reciting this summary, and noting that no one appeared before the Board to contradict that testimony, the Board concluded, and ordered, that "[f]or the reasons set forth in the aforegoing Opinion [5] ... by virtue of the legal non-conforming use existing on the property no violation of the Zoning Regulations of Baltimore County exists on the subject property...." Thus, the order of the Zoning Commissioner was reversed. Nowhere in its opinion or Order did the Board define the non-conforming use, or even suggest what its parameters were.

The Zoning Commissioner inquired again into Mr. McKemy's activities in 1974, as the result of a complaint that Lot 442 and Lots 378 through 387 were being used "for a

---

3. The Board did not indicate specifically what "the property in question" was. It appears from the ensuing paragraphs of the Board's opinion that it was referring to the lots in question here — those on the *south* side of Snyder Avenue.

4. The exact location of this business in relation to the garage or the lots in question here was never made clear.

5. No reasons of the Board were stated in the "aforegoing Opinion", which was merely a summary of the stipulations and testimony.

truck terminal, the storage of miscellaneous junk, debris, and disabled vehicles". The Zoning Commissioner noted that Lots Nos. 378 through 384 "enjoy a legal nonconforming use for the storage of trucks" but stated the issue to be whether the non-conforming use was "for the storage of trucks in general or, more specifically, the storage of trucks in conjunction with the Defendant's fuel oil business."

The Commissioner pointed out, from the evidence before him, that McKemy had "expanded his nonconforming use by storing fuel oil trucks and freight haulers on Lots Nos. 385 through 387" — lots that were not included within the non-conforming use determined by the Board in 1969. Residents testified that "the storage of trucks, other than fuel oil trucks, has come about recently and has been expanded continuously, not only in volume, but in area." McKemy testified that he began leasing Lots Nos. 378 through 387 from Mr. Narutowitz in 1960; that in addition to hauling and delivering fuel oil, he operates a freight hauling business; and that he began the freight hauling business in 1965.

The Commissioner construed the 1969 Board opinion as granting a non-conforming use as to Lots 378 through 384 "for the storage of fuel trucks only." Thus, he concluded that the storage or parking of "all other type trucks" was a violation of the zoning regulations, as was the expansion of the parking of fuel oil trucks or freight haulers onto Lots Nos. 385 through 387. Finally, he found that "these lots" have also been used "for the operation of a service garage in that vehicles have been repaired on said Lots." As to this, he ordered that no disabled vehicles be stored on Lots Nos. 378-384, under any circumstances, that they not be stored on Lot No. 442 unless it was properly screened, and no repairs take place on "that portion of the subject property in front of the service garage, facing Sparrows Point Road and/or Snyder Avenue."

Once again, McKemy appealed to the Board of Appeals which, in October, 1976, affirmed the Zoning Commissioner.[6]

---

**6.** The record does not disclose any explanation for the lapse of more than two years between the order of the Zoning Commissioner and its affirmance by the Board of Appeals.

The Board concluded that the Zoning Commissioner "fairly and correctly interpreted the 1969 ruling of this Board, and furthermore correctly decided the issues concerning the alleged zoning violations." With respect to the earlier opinion, the Board explained:

> "This Board now states that its decision of April 30, 1969 is meant to find a nonconforming use for the parking of fuel trucks only on lots 378 through 384, and that the storage and/or parking of all other type trucks is not permitted. The distinction that the Board wishes to explain is that it is our judgment that the nonconforming use for the above described lots, and only said lots, stems from the use of these lots from 1936 through to the present day only in direct connection with the business function admittedly taking place on the lot on the north side of Snyder Avenue.
>
> "The Board will not distinguish between the parking for the restaurant and bar business, the parking for the rooming house and the parking for the fuel oil business, considering the same to be nonconforming parking in direct relationship to the business function of the above described lot on the north side of Snyder Avenue. However, the Board will distinguish and shall not permit any extension of this existing nonconforming use in area, or in use for functions which involved businesses outside and beyond the direct business use of the lot on the north side of Snyder Avenue."

On appeal by both McKemy and the county, the Circuit Court concluded that, "[w]hat started out as an off-street parking lot prior to 1969, which was legalized as a non-conforming use by the Board's decision of 1969, remains as an off-street parking lot today." Although the "additional uses" as a truck terminal and a junkyard were illegal, the court noted that the Board's order "will result in the termination of the illegal uses, without impairment of the legal non-conforming use of the property, as an off-street

parking lot...". In effect, the court considered the non-conforming use to permit any kind of parking on the lots included within the 1969 decision, but deemed the "truck terminal operations and junkyard purposes" to be something other than parking, and, for that reason, not permitted.

At the same time, the court ruled against the county in its cross-appeal by concluding that there was no legal error in the Board's 1969 determination of a valid non-conforming use.

The only thing that can be said with any appreciable degree of certainty from the record before us is that it is terribly confusing.

At the outset, we may dispose of the questions concerning Lots 385-387. There was sufficient evidence before the Zoning Commissioner, the board, and the court to justify their respective conclusions (expressed or implied) that a valid non-conforming use did not exist with respect to those lots, that they are therefore subject to the county zoning regulations, that the parking or storing of trucks or other motor vehicles on those lots is not permitted under the applicable zoning regulations, and that such unlawful uses must stop. Thus, paragraph number 6 of the 1974 order of the Zoning Commissioner, affirmed by the Board of Appeals in 1976 and subsequently by the Circuit Court, will be affirmed by us.

With respect to Lots 378-384, we believe that there was sufficient evidence before the Zoning Commissioner, the board, and the court to justify their respective conclusions that, whatever non-conforming use existed as to those lots, it did not include the dismantling of motor vehicles, the storage of disabled vehicles, junk, or debris, or any operations accessory to a garage. Those uses are therefore subject to control by the county; and, accordingly, paragraphs numbers 3, 4, 5, and 7 of the 1974 order of the Zoning Commissioner, affirmed by the Board of Appeals in 1976, and subsequently by the Circuit Court, will also be affirmed by us.

We turn now to what the parties are really fighting about — whether the trucking operations on Lots 378-384 and 442 are protected by a valid existing non-conforming use — and direct our attention initially to the 1969 proceeding.

The first principle to have been applied by the Board in 1969 was the introductory clause to Article XI of the 1945 zoning regulations: "A lawful non-conforming use *existing on the effective date of the adoption of these regulations* may continue. . . ." (Emphasis supplied.) Its first task, therefore, was to determine what lawful non-conforming use existed with respect to these lots on January 2, 1945. As to this, the evidence established that, since 1936, some part of those lots had been used for the temporary parking of cars and trucks by the transient patrons of a restaurant and bar located across the street. There being nothing to suggest that this was an unlawful use, we have no difficulty in accepting the Board's conclusion that a lawful non-conforming use was in existence on January 2, 1945, with respect to at least some part of those lots.

The second principle to be applied was stated in § 104.1 of the then-applicable zoning regulations: "provided that upon any change from such nonconforming use to any other use whatsoever . . . the right to continue or resume such nonconforming use shall terminate." Thus, the second task was to determine what uses had been made of the lots since January 2, 1945, and whether any of them constituted a "change . . . to any other use" from that existing prior to such date.

As to the post-1945 uses, the evidence showed that, in 1951, with the closing of the restaurant, some part of the lots began to be used for the parking of vehicles in connection with the rooming house. There was no evidence to suggest that this use was an intensified one, or a different one; and the Board could properly have inferred that it did not constitute a "change" from the 1945 use. It was still transient parking as an accessory to an unrelated small retail business across the street.

With respect to McKemy's operations, the 1969 opinion of the Board shows only that the parties stipulated that the lots "are being used for the parking of trucks and other vehicles in conjunction with a fuel oil business" operated by McKemy. This stipulation was also supported by Mr. Narutowitz and never contradicted. There was no evidence before the Board

at that time to show whether, or to what extent, McKemy's use was any different from those that preceded it.[7] Based upon that record, its conclusion that there was no existing violation of the zoning regulations was not inappropriate. We therefore find against the county in its cross-appeal.

The basis of the non-conforming use declared at that time was the parking of trucks and vehicles generally, not just fuel trucks. Indeed, there was nothing in the record to show that fuel trucks, in particular, had ever been parked on those lots prior to 1945. Thus, upon that record, there would have been no justification for the 1969 Board to restrict the non-conforming use to the parking of fuel trucks; and had it imposed such a limitation, its action in doing so would have been unsupported by substantial evidence and therefore arbitrary and capricious. That being so, there is little, if anything, that can be said in defense of the attempt by a substantially reconstituted Board seven years later to superimpose such a limitation through the guise of explaining what it presumed the earlier Board to have intended. That is arbitrariness multiplied by itself; and thus, the decision in 1976 to declare the non-conforming use to be limited to the parking of fuel trucks was clearly erroneous, as a matter of law.

Lest Mr. McKemy become prematurely jubilant, however, we hasten to add that the 1976 Board made an even more fundamental error, requiring that the case be remanded to it for reconsideration.

The heart of the Board's 1976 decision was its statement, previously quoted, that the non-conforming use stems from the use of the lots "only in direct connection with the business function admittedly taking place" across the street; that, with respect to such use, the Board "will not distinguish between the parking for the restaurant and bar business, the parking for the rooming house and the parking for the fuel oil business, considering the same to be nonconforming parking

---

7. In particular, we note that there was no evidence before the Board in 1969 (or at least none that the record reflects) with respect to any freight hauling activity on those lots, notwithstanding Mr. McKemy's later assertion that such operations commenced in 1965.

in direct relationship to the business function" carried on across the street; but that it would not permit any "extension of this existing nonconforming use" either in area or for "functions which involved businesses outside and beyond the direct business use" across the street.

This declaration appears to rest upon an admixture of two dubious concepts. The first is that a parking lot is a parking lot is a parking lot, which is simply not so. The second, for want of a better description, appears to be a doctrine of "extended accessoryship" — *i.e.,* that if, prior to zoning, these lots were used for parking as an accessory to activities conducted on a lot across the street, they may, within the protective ambit of "nonconforming use", continue to be used for parking as an accessory to the activities conducted on that other lot no matter how the actual use of either parcel has changed since the advent of zoning. That too is inappropriate.

From their inception in 1945, the county zoning regulations have rejected the notion that all parking lots are the same, and have instead drawn careful distinctions between types of parking uses.[8] To do otherwise would blur obvious and important distinctions, given clear recognition by the courts, between the "parking" and the "storage" of vehicles,[9] between the parking or storage of commercial vehicles and the parking or storage of non-commercial vehicles,[10] between the business of renting parking spaces and parking as an accessory use,[11] and between parking *qua* parking and

---

8. *See, for example,* the original 1945 regulations: Section 1 — Definitions, ¶¶ 15, 16, and 17, distinguishing different types of garages; Section XIII-C, requiring a special exception for the use of land in a residential zone for the parking of automobiles and prohibiting thereon the parking of vehicles other than passenger cars. *See also* § 409 of the current county zoning regulations.

9. Monument Garage Corporation v. Levy, 194 N.E. 848 (N.Y., 1935): "There is a substantial distinction, clearly cognizable, between the meaning of 'storage' and 'parking'. One has a certain degree of permanency, while the other connotes transience." *See also* Service Realty Corp. v. Planning and Zoning Bd. of Ap., 109 A. 2d 256 (Conn., 1954); State v. Breidenbach, 213 N.E.2d 745 (Ohio, 1964).

10. Charles Land Co. v. Zoning Bd. of Review of Providence, 206 A. 2d 453 (R.I., 1965): variance for off-street parking of commercial vehicles in a residential zone denied where ordinance permitted variance only for parking of non-commercial vehicles. *See also* Dumais v. Somersworth, 134 A. 2d 700 (N.H., 1957); People v. Scrafano, 12 N.W.2d 325 (Mich., 1943).

11. State v. Gruber, 10 So. 2d 899 (La., 1942).

parking as part of a commercial enterprise.[12] All parking lots are not the same, and one type of parking use does not *necessarily* beget or permit another.[13]

The Board had established, in 1969, that the non-conforming use was for the transient parking of trucks and other vehicles as an adjunct to a restaurant business, and that the 1969 use was for the parking of trucks and other vehicles in conjunction with a fuel oil business. Both findings, we have stated, were supported by the record, at that time, and therefore should not be questioned now. By affirming the Zoning Commissioner in 1976, the Board concluded that, as of 1974, Mr. McKemy had expanded his use of the lots to include the "storage" of trucks (fuel oil and other), that the adjunctive or accessory use was not only in connection with a fuel oil business but general freight hauling as well, and that the trucking operations had expanded not only in intensity and volume, but also in area.

Upon those findings, it was incumbent upon the Board to determine, factually, whether those expanded uses represented a permissible intensification of the original use or an actual change from what the 1969 Board found existed in 1945 "to any other use whatsoever." In making that determination, the Board was not required to assume, and should not have assumed, that the lowest common denominator was "parking", or even "parking" in conjunction with a business across the street. In deciding whether the current activity is within the scope of the non-conforming use, the Board should have considered the following factors: [14]

(1) to what extent does the current use of these lots reflect the nature and purpose of the original non-conforming use;

(2) is the current use merely a different manner of utilizing the original non-conforming use or does it constitute a use different in character, nature, and kind;

---

12. City of Omaha v. Cutchall, 114 N.W.2d 6 (Neb., 1962).

13. *See, for example,* Cleland v. City of Baltimore, 198 Md. 440 (1951); Appeal of Yocom, 15 A. 2d 687 (Pa. Super., 1940); but *cf.* Kramer v. Town of Montclair, 109 A. 2d 292 (N.J. Super., 1954).

14. *See* New London v. Leskiewicz, 272 A. 2d 856 (N.H., 1970); Powers v. Building Inspector of Barnstable, 296 N.E.2d 491 (Mass., 1973); Board of Selectmen of Blackstone v. Tellestone, 348 N.E.2d 110 (Mass. App., 1976).

(3) does the current use have a substantially different effect upon the neighborhood;

(4) is the current use a "drastic enlargement or extension" of the original non-conforming use.[15]

The Board undoubtedly had some of these factors in mind, but its consideration of them was obviously flawed when it viewed the issue simply as "nonconforming parking in direct relationship to the business function" across the street. Because of its inappropriate reliance on that test, the Board failed to come clearly and completely to grips with these more relevant criteria. For that reason, and not because of any inherent unsoundness in the findings themselves, the conclusions of the Board as to whether the 1974 activities of Mr. McKemy with respect to Lot 442 and Lots 378-384, violate the county zoning regulations cannot stand. Instead, we shall remand that part of the case embodied in paragraphs numbers 1 and 2 of the 1974 order of the Zoning Commissioner to the Circuit Court with instructions that it, in turn, remand the case to the Board for reconsideration. The Board should consider not only whether, and to what extent, any such current uses exceed the permissible limits of the original non-conforming use, but, if it finds such excess, whether, by virtue of § 104.1 of the county zoning regulations, the entire non-conforming use has been lost.

## II. *Bill No. 18-76*

Bill No. 18-76 was a comprehensive ordinance "to amend the Baltimore County Zoning Regulations to regulate truck oriented uses of property in Baltimore County" that was adopted by the County Council in March, 1976. Among other things, the ordinance defines and regulates "trucking facilities".

McKemy contends that, if his use of the lots in question qualifies, under Bill No. 18-76, as a "trucking facility", the county "must follow the restrictions set forth therein." There

---

**15.** Jahnigen v. Staley, 245 Md. 130 (1967); Phillips v. Zoning Commissioner, 225 Md. 102 (1961).

is nothing in the record, however, to indicate whether his operations do or do not qualify as a "trucking facility", and we are therefore unable to determine whether or not the ordinance applies. On remand, the Board of Appeals can consider the applicability of the ordinance and its effect, if applicable, upon any non-conforming use it may find to continue in existence.

> *Judgment of the Circuit Court for Baltimore County affirmed in part and reversed in part; case remanded to that court for remand to the County Board of Appeals of Baltimore County for reconsideration in conformance with this opinion; costs to be divided equally between the parties.*