[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This administrative appeal involves a property and building known as "Hamilton House." Hamilton House is located in an R-5.2 residential zone within the City of Groton. Rooming houses are not a permitted use in this zone. William O. Rabitaille owned the property for years. He ran it as a rooming house. His use of the property as a rooming house began before the R-5.2 zoning of the area. Rabitaille was allowed to continue Hamilton House as a rooming house because it was a nonconforming use.
On February 29, 1996, the plaintiff, Fellowship House Ministries, Inc. (FHMI), purchased Hamilton House from Rabitaille.
The plaintiff contracted to provide "transitional housing services" to the Alternative Incarceration Center located in New London. The Alternative Incarceration Center is run by Connecticut Halfway Houses, Inc. pursuant to a contract with the Office of Alternative Sanctions, a part of the Judicial Branch of the State of Connecticut.
Shortly after February 29, 1996, the plaintiff began providing "transitional housing services" at Hamilton House.
The record does not contain a definition of "transitional housing services."
The city's zoning enforcement officer investigated. On March 25, 1996, he issued a cease and desist order. In that order, the zoning enforcement officer stated his conclusion that the property's use had been changed from a rooming house to an alternate incarceration center. According to the zoning enforcement officer, this violated Section 5.2 of the Zoning Regulations.[1] Letter to Fellowship House Ministries, dated March 25, 1996, from David Atkinson, Zoning Building Official. Exhibit 1. CT Page 12302
Fellowship House Ministries, Inc., appealed to the defendant zoning board of appeals. A public hearing was held on May 29, 1996. On June 11, 1996, the board voted to uphold the zoning enforcement officer's decision. The board's principal holding was that there had been a "[c]hange of use from a non-conforming rooming house to an alternative incarceration center." Zoning Board of Appeals Minutes, June 11, 1996. Record Item # 32.
This timely appeal by plaintiff, Fellowship House Ministries, Inc., followed.
AGGRIEVEMENT
The plaintiff bares the burden of showing aggrievement. C.G.S. § 8-8 (b). Aggrievement may be established by "facts established in the record as a whole, including the administrative record." State Library v. Freedom of InformationCommission, 240 Conn. 824, 830, 832 (May 13, 1997).
The defendant board does not contest aggrievement. Transcript of Court Proceedings, 7/24/1997. p. 46.
The plaintiff owns the property. It obviously will be harmed by the defendant's ruling; it must cease its present operation of Hamilton House. And, if Hamilton House has not been used as a "rooming house" for six months, its use again as a rooming house is in jeopardy. Section 5.7.[2]
The court finds the plaintiff is aggrieved.
DISCUSSION
Hamilton House when owned and operated by Rabitaille was allowed to run as rooming house. Its use as a rooming house preceded the adoption of the residential zoning of the area.
 "Non-Conforming Use — A use, whether of a building, structure or lot, or both, legally existing on the effective date of these regulations or any amendments thereto which does not conform to these use regulations of the zoning district in which it is located." Zoning Regulations, City of Groton, Section 7.2, page 109. Exhibit 10.
Hamilton House as a rooming house was a nonconforming use as of February 29, 1996 when Rabitaille sold it to plaintiff. CT Page 12303 Transcript of ZBA Proceedings, 5/29/1996, pp. 5 and 14.
The zoning enforcement officer and the defendant zoning board of appeals determined that under plaintiff's ownership and operation, Hamilton House was no longer a rooming house, but rather, an alternate or alternative incarceration center.[3] An alternate or alternative incarceration center is not a use permitted in the R-5.2 zone. Zoning Regulations, City of Groton, Section 2.4, page 10. Exhibit 10.
The plaintiff claims Hamilton House is still a rooming house. Plaintiff makes no claim under Section 5.2 of the zoning regulations which in some situations permits a change of a non-conforming use. Amendment To Appeal, July 25, 1996. [102] Plaintiff acknowledged that it makes no claim under § 5.2. Transcript of ZBA Proceedings, 5/29/1997, p. 10; Transcript of Court Proceedings, 7/24/1997, p. 37, 44. See also Letter dated May 25, 1996 from Attorney Eric M. Janney, Plaintiff's counsel, to David Atkinson, Zoning and Building Official, p. 3. Exhibit 2.
The court is called upon to review the action of the zoning board of appeals which in turn had reviewed the action of the zoning enforcement officer.
 "[F]ollowing an appeal from the action of a zoning enforcement officer to a zoning board of appeals, a court reviewing the decision of the zoning board of appeals must focus, not on the decision of the zoning enforcement officer, but on the decision of the board and the record before the board." Caserta v. Zoning Board of Appeals, 226 Conn. 80
(1993).
The court examines the action of the zoning board of appeals and the basis for its action.
The board gave reasons for its decision. The primary stated reason was a "[c]hange of use from a non-conforming rooming house to an alternative incarceration center [which] is in violation of Section 5.2" Zoning Board of Appeals Minutes, June 11, 1996. Record Item # 32.
Our Supreme Court has defined the trial court's role where a zoning board of appeals has stated the reason(s) for its decision.
"`Where a zoning agency has stated its reasons for its actions, the CT Page 12304 court should determine only whether the assigned grounds are reasonably supported by the record; and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . . The [decision] must be sustained if even one of the stated reasons is sufficient to support it. . . . [This] applies where the agency has rendered a formal, official, collective statement of reasons for its action.' (Citations omitted; internal quotation mark omitted.) Protect Hamden/North Haven from Excessive Traffic Pollution, Inc. v. Planning Zoning Commission, 220 Conn. 527, 544, 600 A.2d 757 (1991)." Bloom v. Zoning Board of Appeals of the City of Norwalk, 233 Conn. 198, 208 (1995).
At another time, the Supreme Court has held that where a decision of a zoning board of appeals is based on its finding of facts, the issue in such case is whether "that finding is supported by substantial evidence. Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 541, 525 A.2d 940 (1987)."Zachs v. Zoning Board of Appeals, 218 Conn. 324, 329-30 (1991).
"The burden of proof to demonstrate that the board acted improperly is upon the party seeking to overturn the decision . . . ." Francini v. Zoning Board of Appeals, 228 Conn. 785,791 (1994).
The court's role is limited. It must review the record (1) to "determine only whether the assigned grounds ["c}hange of use from a non-conforming rooming house to an alternative incarceration center [which] is in violation of Section 5.2"] is reasonably supported by the record" and (2) "whether they [the assigned grounds] are pertinent to the considerations which the authority was required to apply under the zoning regulations."
The court understands that the plaintiff does not challenge the pertinence of the considerations which the zoning board of appeals was required to apply under the regulations.
This appeal rises or falls on whether there is sufficient material in the record before the defendant board to support the board's conclusion that Hamilton House is not a rooming house.[4]
The Regulations define "rooming house:"
 "Rooming House — A building in which rooms are rented for compensation to more than one (1) and less than sixteen (16) persons other than members of the family of the proprietor. The serving of CT Page 12305 meals or provisions for cooking is prohibited." Zoning Regulations, City of Groton, ZBA Exhibit 10, p. 109.
The board did not spell out the basis for its conclusion that the present use of Hamilton House was not a rooming house.
By statute, the board was empowered to decide the appeal. C.G.S. § 8-6. The zoning regulations also give the zoning board of appeals the power and duty to —
"Decide Appeals
 "Hear and decided [Sic] appeals where it is alleged there is error in any order, requirement or decision made by the Zoning and Building Official in the enforcement of this ordinance." Zoning Regulations, City of Groton, Section 6.2, page 81. Exhibit 10.
Our law is clear. A zoning board of appeals has the authority to interpret the zoning regulations.
 "The board is entrusted with the function of interpreting and applying its own zoning regulations. . . . A local board or commission is in the most advantageous position to interpret its own regulations; and apply them to the situations before it. Therefore, as long as honest judgment has been reasonably and fairly exercised at the local level, the trial court must not substitute its judgment for that of the zoning board." New London v. Zoning Board of Appeals, 29 Conn. App. 402, 405 (1992).
In order to perform its duty in this case, the board had to consider and decide the meaning of the regulation defining "rooming house."[5] In fact, plaintiff's counsel told the board it was "empowered to interpret the regulations" and it had a duty to do so. Transcript of ZBA Proceedings, 5/29/1996, p. 36.
The court believes a literal reading of the definition of "rooming house" in the regulations contemplates two to sixteen individuals each renting a separate room. If the board so read the regulation, the court would uphold that interpretation. But the record does not show whether the board did have this meaning in mind. If it did, there was evidence before the board Hamilton House rooms were not "rented for compensation to more than one (1) and less than sixteen (16) persons." The board might well have believed the testimony produced by the plaintiff: CT Page 12306
 "We have contracted for all the beds because the New London Court has, I think, accurately predicted that they would have a need for that amount of beds." Testimony of Jim Greene, Deputy Director of Field Services for the Office of Alternative Sanctions. Transcript of ZBA Proceedings, May 29, 1996, p. 20. Record Item # 36.
Other evidence confirmed that by contract, the State of Connecticut, not the individual inhabitants, was paying for the "transitional housing services" at Hamilton House. See Exhibit 6 and 8.
The record shows that plaintiff contracted to provide all of Hamilton House's 14 bed[room]s to Connecticut Halfway Houses, Inc. in accordance with a proposal plaintiff had made to the Connecticut Halfway Houses, Inc.[6] Pursuant to this agreement, Connecticut Halfway Houses, Inc. subcontracted to plaintiff "that portion of its [CHHI's] Agreement[7] with the Office of Alternative Sanctions . . . pertaining to transitional Housing services . . . ." Agreement between Connecticut Halfway Houses, Inc. and Fellowship House Ministries, Inc. Exhibit 7. It is obvious that the State of Connecticut is the ultimate source of the funds paid to plaintiff. See letter dated December 11, 1995, to Fellowship Home Ministries, Inc. from William H. Carbone, Director, Office of Alternative Sanctions. Exhibit 7. The contract belies any claim that the "rooms are rented for compensation to more than one (1) and less than sixteen (16) persons" as is contemplated by the regulation.
At the court hearing, counsel for the plaintiff candidly described the arrangement:
 "Now, I'd like to make a comment about the for hire or compensation. How the corporation is compensated for these rooms. They have a contract with Halfway House of Connecticut Corporation, and they're paid a sum for those rooms, for the block of rooms, for the tenants that are referred." Transcript of Court Proceedings, 7/24/1997, p. 14.
The evidence before the board warranted a finding by the board that there was not a rental of rooms to various individuals. That record warrants a finding plaintiff contracted to let the entire Hamilton House premises as a whole to Connecticut Halfway Houses, Inc. and the Alternative Incarceration Center. Therefore, the board could have concluded Hamilton House was not a rooming house. CT Page 12307
There was other, more than ample, evidence before the board to support its conclusion that the operation of Hamilton House was not that of a rooming house.
ADMISSION SELECTIVITY
Hamilton House limits its inhabitants to court referrals. Transcript of ZBA Proceedings, 5/29/1996, p. 7. Record Item # 36. Each inhabitant of Hamilton House had been ordered to report to and attend the Alternative Incarceration Center (AIC) by a judge of the Superior Court. The Alternative Incarceration Center, as indicated by its very name, is used by the courts in lieu of jail. Reporting to the AIC is ordered in lieu of going to jail. Each inhabitant was a jail-bound criminal offender. See reprint of The Connecticut Law Tribune article, "Why Connecticut's Alternative Sanctions Program Works" by Judge Aaron Ment, Chief Court Administrator of Connecticut's Judicial Branch. Exhibit 20. Instead of jail, the criminal offender was given the opportunity to participate in the programs of the Alternative Incarceration Center (AIC). The AIC for the most part is not a residential program. Most of the persons involved in the AIC programs are not subject to around-the-clock supervision by the AIC. But some are. Those who require around-the clock supervision are provided with what is dubbed "transitional housing services" at Hamilton House.
The evidence before the board made it abundantly clear that the persons residing at Hamilton House were those deemed to be the more difficult of all those referred to the AIC by the criminal court judge.
 "Residents of Hamilton House . . . are referred to Hamilton House as an alternative to incarceration and therefore are afforded limited freedom of the community. Hamilton House Handbook For Residents, p. 11, Exhibit 8.
 "The purpose of the Transitional Housing Component is to augment the existing services for the area through the AIC program in the Norwich/New London area. This component would provide for more intensive supervision of clients of the AIC program . . . ." Proposal, July 31, 1995, submitted by Fellowship House Ministries, Inc., Exhibit 6.
Mayor Bette Giesing appeared before the board and reported on a meeting attended by Judge Kevin McMahon.[8] She said she CT Page 12308 asked Judge McMahon where the present residents of Hamilton House would go if it were closed. She reported: "Judge McMahon's reply was that if the Hamilton House was closed the residents would be sent to a prison." Transcript of ZBA Proceedings, 5/29/1996, p. 34; Record Item # 36; letter from Mayor Giesing to the Zoning Board of Appeals dated May 29, 1996, p. 1, Exhibit 28. See also letter dated May 24, 1996 to Mayor Giesing from Richard J. Harrison, Executive Director of Fellowship House Ministries, enclosing "intake criteria for Hamilton House." Exhibit 9A.
In short, the zoning board of appeals was told, were it not for Hamilton House, each person housed at Hamilton House belonged in jail. In view of the selective requirements for admission, the board could have viewed Hamilton House to be markedly different from a rooming house.
SECURITY AND RESTRICTIONS
Plaintiff, in making its proposal stated:
 "In the interest of public safety, this proposal seeks to provide a high measure of client supervision and accountability with the clients [Sic] need for quality services." Proposal, July 31, 1995, submitted by Fellowship House Ministries, Inc., Summary of Proposal, Section B-1. Exhibit 6.
 "The purpose of the Transitional Housing Component is to augment the existing services provided for the area through the AIC program in the Norwich/New London area. This component would provide for more intensive supervision of clients of the AIC program . . . ." Proposal, July 31, 1995, submitted by Fellowship House Ministries, Inc., Summary of Proposal, Section B-18. Exhibit 6.
"Hamilton House acts as a liaison to and in concert with the Alternative Incarceration Center program to provide a maximum level of supervision for our residents . . . ." Hamilton House, Handbook For Residents, Rules and Regulations, Statement of Purpose, p. 3. Exhibit 8.
Just how the residents are afforded "more intensive supervision" and "are afforded limited freedom of the community" was also explained to the board.
"There are staff members on at all times, 24 hours a day, CT Page 12309 seven days a week." Transcript of ZBA Proceedings, 5/29/1996, p. 22. Record Item # 36. There are two staff on at all times. Id., 23. The staff are primarily security monitors. Id., 24. "The staffing pattern of the program will provide for monitoring client activity within the facility at all times that clients are present." Proposal, July 31, 1995, submitted by Fellowship House Ministries, Inc., Summary of Proposal, Section B-18. Exhibit 6. "The staff person on duty is expected to know the whereabouts of each resident at all times." Hamilton House, Handbook For Residents, Rules and Regulations, p. 11. Exhibit 8.
Hamilton House is equipped with "a security system so that the staff would be aware of any unauthorized entrance or exit from the building and installed a closed circuit television cameras for the common areas, specifically highlighting the entrance doors and exits at the property." Transcript of ZBA Proceedings, 5/29/1996, p. 21. The alarm system "was installed at the urging of the Mayor." Id. Its purpose is —
 "to let us know whether there is any unauthorized entrance or exits but it also serves the dual purpose of making sure that we are aware that if any of our clients do leave the facility, that we can make appropriate notification to the authorities to let them know that the people have left and, in fact fulfill our contract with the Judicial Department." Id.
On weekends, some of the inhabitants are eligible for passes permitting them to leave Hamilton House for up to eight hours, or maybe twelve. They must return at the end of the time stated in the pass. For those not on pass, staff accompanies the inhabitant even to go to the park to play basketball.[9] "We know where anybody is at any given time." Id., 25.
Hamilton House oversees more than physical presence.
 "Hamilton House will periodically contact residents' employers concerning attendance, reliability, and job performance." Hamilton House, Handbook For Residents, Rules and Regulations, p. 10. Exhibit 8.
 Residents have to inform Hamilton House staff of any plan to terminate or change employment." Id.
 Residents' paychecks are photocopied and kept in the resident's file." Id., 13. CT Page 12310
 Employed residents are encouraged to open a savings account. The account must be a pass book account joint with Hamilton House. The pass book is kept by Hamilton House and "given to the resident as required for deposits and emergency withdrawals only." Id., 13.
The rooms and belongings of residents are subject to search at any time.
 "Periodic searches of the facility will be conducted by staff to determine if contraband has been introduced into the facility. All residents will be expected to cooperate with staff in the conduct of these periodic searches. Searches may also be held to locate missing personal property. All areas of the facility as weel as all personal property will be subject to search." Hamilton House, Handbook For Residents, Rules and Regulations, p. 12. Exhibit 8.
These features of life and the regimen at Hamilton House could readily have lead the board to believe that housing was only one, perhaps minor, although necessary,[10] component of "transitional housing services."
FINANCIAL, STAFFING AND INSURANCE
For the two-year period, July 1, 1996 to June 30, 1998, the amount to be paid plaintiff for transitional housing services at Hamilton House was not to exceed $ 587,991. See Agreement between Connecticut Halfway Houses, Inc. and Fellowship Home Ministries, Inc., pp. 2-3. Exhibit 7. There were 14 rooms. Each was touted as "airy and clean, and is comfortably furnished." Exhibit 14. Care of each individual's room is the responsibility of the resident. Hamilton House, Handbook For Residents, Rules and Regulations, p. 6. Exhibit 8. Housekeeping is provided by the residents. Id. Thus, the costs for housekeeping and upkeep of the physical plant are at a minimum. But for each room plaintiff appears to be paid up to $404 per week, a handsome sum by any measure. [$587,991 ÷ 14 (rooms) ÷ 104 (weeks) = $404] Even if percale three hundred thread count sheets and pillow cases by Hermes were used and changed every day by a chambermaid, the amount paid for "transitional housing services" surely indicates something more than and beyond the mere letting of rooms. Common sense and simple arithmetic told the defendant board that something was going on at Hamilton House other than a straightforward rooming house operation.[11]
CT Page 12311
One benefit of the Alternative Incarceration Program is economic. "Savings: The annual average cost for a slot in an AIP program is $5,000, compared with the annual cost of $25,000 for housing an inmate in prison." See reprint of The Connecticut Law Tribune article, "Why Connecticut's Alternative Sanctions Program Works" by Judge Aaron Ment, Chief Court Administrator of Connecticut's Judicial Branch. Exhibit 20. But the annual cost for "transitional housing services" for a Hamilton House resident is in the order of $20,000. See discussion on two previous pages including footnote 11. This does not include the cost for the services provided at the Alternative Incarceration Center in New London. Statewide, these services cost $5,000 per year per participant. Id. Thus, a Hamilton House resident costs the State approximately as much a it does a prison inmate. Again, these figures indicate that "transitional housing services" involves something well beyond the mere rental of rooms.
Hamilton House rules provide that residents who can afford it are to be charged "room charges" at a maximum of $60.00 per week. Hamilton House, Handbook For Residents, Rules and Regulations, p. 17. Exhibit 8. The board could have taken the $60.00 per week as plaintiff's estimate of the cost of the housing component of "transitional housing services." Likewise, it could have taken the difference between $60.00 per week and the $404 (or approximately $375) per week Hamilton House was paid per room for "transitional housing services" as the amount paid for the non-housing components of "transitional housing services."[12]
Nor does the Hamilton House staff consist of janitors, housekeepers, chambermaids or the like. A Program Director, an Operations Assistant, a Senior Case Manager, Case Manager, and Security Monitors make up the staff. And, plaintiff is required by its contract to maintain Professional Liability insurance of at least $500,000.[13] Agreement between Connecticut Halfway Houses, Inc. and Fellowship House Ministries, Inc., pp. 8, 14. Exhibit 7. These facts, staff titles and professional liability insurance coverage, again indicate that "transitional housing services" includes something more than a normal rooming house operation.
The board had evidence which indicated the State was paying for much more than mere housing. The amount being paid, the staffing, and the professional liability insurance requirement CT Page 12312 warranted a board belief that Hamilton House was providing something more than the mere rental of rooms.
MORE THAN THE RENTAL OF ROOMS
The definition of a rooming house contemplates a use only within that definition, i.e., "a building in which rooms are rented . . . to more than one (1) but less than sixteen (16) persons." If the building is used for more than the rental of rooms for compensation to separate individuals, it is not a rooming house within the zoning regulations. The zoning regulations do not permit a use of a building wherein rooms are rented and, in addition, for example, the operation of a restaurant. In short, if the property is used to provide more than room rentals, it loses its rooming house character; it is not a rooming house.
The issue here is whether there has been a change in use of Hamilton House. Has the fundamental character been changed? Plaintiff contends the character of the use has not changed. Providing individuals with housing, a place to live (sleep), according to plaintiff, is the same as it was when Rabitaille ran Hamilton House as a rooming house. Plaintiff claims Hamilton House is a rooming house with strict rules.[14] The housing component does continue under plaintiff's ownership and operation. But if the operation has added other components, the overall character and essence may have changed although housing is still provided. For example, if the property were used to provide long or short term in-patient medical care, that would be a change of fundamental character even though the building continues to provide housing. Plaintiff concedes that such an in-house patient care operation would constitute a change of use such that the premises could no longer be classified as a rooming house. Transcript of Court Proceedings, 7/24/1997, pp. 52.
The dominant purpose of the AIC's using the "transitional housing services" of Hamilton's House is not simply giving up to 14 persons a place to live.[15] The central component is the control and supervision of these special individuals. As an adjunct to this need to provide near around-the-clock supervision, housing necessarily must be provided. Housing is not the primary ingredient. Under plaintiff's regime, the structure, supervision, and the like, afforded those committed to it are Hamilton House's raisons d'etre.
CT Page 12313
Plaintiff claims the services afforded by the AIC are not provided at Hamilton House. The record does not spell out just what services the AIC provides. However, the residents of Hamilton House are under the eyes of the Hamilton House staff far more than those of the AIC staff. Each weekday Hamilton House residents spend their time after breakfast until just before dinner with and at the AIC. However, at the end of their day at the AIC, they are taken by Hamilton House staff to dinner at the plaintiff's across-town Fellowship House facility for dinner. After dinner, Hamilton House staff transports them to Hamilton House where they stay overnight. In the morning, Hamilton House staff drives them to Fellowship House for breakfast.[16] After breakfast, Hamilton House staff drives them to the AIC where they stay for the normal work day.
On weekends, the residents do not go to the AIC. They are the responsibility of the Hamilton House staff for the entire weekend, from late Friday afternoon to Monday morning after breakfast.
It is clear Hamilton House residents are under the control of the Hamilton House staff 15 to 16 hours every weekday and all of the time on weekends. The zoning enforcement officer and the zoning board of appeals were not off the mark when they described Hamilton House as an "alternate incarceration center."
MISCELLANEOUS FACTORS
Plaintiff's witnesses used the term "beds," as opposed to "rooms" when describing Hamilton House.[17] "Beds" are often used to describe facilities like hospitals and, in recent years, correctional facilities. "Beds" is not a term used commonly to describe the capacity of a rooming house. Similarly, the persons housed at Hamilton were referred to as "clients." Using "beds" as opposed to "rooms" and describing the residents as "clients" suggests the "transitional housing services" includes more than the mere rental of rooms and perhaps is indicative of a institution providing more than just a place to sleep. It could have been so construed by the board.
PLAINTIFF'S USE VERSUS RABITAILLE'S
The evidence comparing Rabitaille's and plaintiff's operation of Hamilton House indicates the operations were quite different. Transcript of ZBA Proceedings, 5/29/1996, pp. 7, 8, 9, 12, 27, 30-31. The board readily could have concluded that CT Page 12314 Rabitaille ran a traditional rooming house. This is a far cry from plaintiff's use of the property. Plaintiff does provide housing for select persons. But housing is only an incidental to the mission plaintiff has described as providing "a high measure of client supervision and accountability," "a maximum level of supervision of our residents," so that "the whereabouts of each resident [is known] at all times," and "[w]e know where anybody is at any given time."[18] The evidence would justify a conclusion by the board that Hamilton is now akin to a corrections facility. The evidence is sufficient to support a conclusion that Hamilton House is no longer a rooming house like Rabitaille ran.
Our Supreme Court has stated the factors to be considered in determining whether a property is being used within the scope of nonconforming use. Zachs v. Zoning Board of Appeals,218 Conn. 324, 332 (1991).
"In deciding whether the current activity is within the scope of a nonconforming use consideration should be given to three factors: (1) the extent to which the current use reflects the nature and purpose of the original use; (2) any differences in the character, nature and kind of use involved; and (3) any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted on the property. See McKemy v. Baltimore County, 39 Md. App. 257, 269-70,385 A.2d 96 (1978); Jasper v. Michael A. Dolan, Inc., 355 Mass. 17, 23,242 N.E.2d 540 (1968); 6 P. Rohan, Zoning and Land Use Controls § 41.03 (3]." Zachs v. Zoning Board of Appeals, 218 Conn. 324, 332 (1991).
Plaintiff's use of the property reflects little of Rabitaille's. The board had evidence from which it could readily conclude that Rabitaille used the property as a traditional rooming house, i.e. the rental of rooms to various individual members of the general public so those individuals had a place to live. There was evidence that exterior doors were locked and the roomers would have to ring for admission by Rabitaille or his manager. There was no suggestion that there were any restrictions on the roomers' freedom. While plaintiff does provide housing of a sort, other aspects of plaintiff's use so far overshadow mere housing that the present use is not a fair reflection of the prior use.
Much of the evidence of Rabitaille's operation and the comparison of it to plaintiff's came from plaintiff's executive director, Richard Harrison. Transcript of ZBA Proceedings, CT Page 12315 5/29/2996, pp. 21 — 33. Harrison said Rabitaille did not allow drinking, drugs, or sleep over guests. Id., 22. Rabitaille's roomers were not required to sign in or out. Id., 26. They did not need permission to go out. Id., 27. As the exterior doors were kept locked, a roomer could only get in by ringing for the manager to have the door opened. Id., 22, 26. Rabitaille required his roomers to be in by an hour certain. Id., 22. Harrison ventured that Rabitaille's and plaintiff's use were the same. Id., 23 But, he acknowledged he couldn't say he was "very familiar" with Rabitaille's operation. Harrison did testify that the clientele is different to some degree. Id., 24 He also testified Rabitaille's code of conduct "was not as strict as ours." Id., 30. Harrison testified that Rabitaille did not have rules regarding breathalyzer tests, drug screening, urinalysis, specific disciplinary program, restricted status, house arrest, misconduct logs, three-step disciplinary program, guidelines for client misconduct, sign-out logs, location control, driving guidelines or restrictions, joint bank accounts, and/or community service requirements. Id., 30-31.
The board had sufficient evidence, much of it detailed above, from which it could have concluded that there were substantial "differences in the character, nature and kind of use involved" in the plaintiff's use of the property when compared to that of Rabitaille. The board would have been justified in concluding the present use of the property is that of a quasi-corrections facility.
There was little, if any, direct evidence showing "any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted on the property." The area was primarily residential, single and two-family houses. Transcript of ZBA Proceedings, p. 5. There was uncontroverted evidence a grammar school was located right across the street from Hamilton House. Transcript of ZBA Proceedings, 5/29/1996, p. 5. While normally a facility such as plaintiff's would not be met with favor in a residential neighborhood, and particularly in; close proximity to a grammar school, there was no evidence to that effect. There was neighborhood opposition to plaintiff's use of the property.
Whether "any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted on the property" has been shown is problematic. But, such a showing, at least in the circumstances of this case, is CT Page 12316 unnecessary.
Since Zachs was decided in 1991, our appellate courts have referred to it five times. See Bauer v. Waste Management ofConnecticut, 234 Conn. 221 (1995); Connecticut Resource RecoveryAuthority v. Planning Zoning Commission, 225 Conn. 731 (1993);DiBlasi v. Zoning Board of Appeals, 224 Conn. 823 (1993); Hall v.Brazzale, 31 Conn. App. 342 (1993); and Koepke v. Zoning Board ofAppeals, 30 Conn. App. 395 (1993). Only two of those cases,Bauer and Brazzale, even refer to the three factors Zachs says should be considered "[i]n deciding whether the current activity is within the scope of a nonconforming use." Zachs, 332. Neither of these cases give any guidance on the question here: Does the absence of a showing "of any substantial [adverse] difference in effect upon the neighborhood" preclude a finding that, the current use is different from, is inconsistent with, and not within, the prior permitted nonconforming use?
The court does not read Zachs as requiring that each of the three factors to be considered must be established in determining "whether the current activity is [or is not] within the scope of the nonconforming use." Zachs, 218 Conn. @ 332.Zachs only says "consideration should be given to [the] three factors." Id. Establishment of each factor is not a sine quo non. The board readily could have found that the first two Zachs
factors had shown that Hamilton House was no longer a rooming house as it had been while owned by Rabitaille. Even if the third or "neighborhood effect" factor was not established, this would not effect a reincarnation of Hamilton House as a rooming house. In short, even if there has not been a showing that the change from Rabitaille's to plaintiff's current activity has brought about "any substantial difference in effect upon the neighborhood," it would not require a different outcome. The court holds that any lack of a showing on the "any substantial difference in effect upon the neighborhood" factor would not require the court to overturn the defendant board's conclusion that there had been a "[c]hange of use from a non-conforming rooming house."
CONCLUSION
The evidence before the defendant board warranted its conclusion that the present use of the property by the plaintiff is not within the scope of the nonconforming use which had been established while Rabitaille owned and operated the property. CT Page 12317
The court holds that the defendant board's stated reason for its action, a "[c]hange of use from a non-conforming rooming house," is, supported by substantial evidence in the evidentiary record before the board. In the court's view, the evidence was such that it required the finding and action of the board.
The appeal is dismissed.
Parker, J.